MAR 18 2020 PM 3:39
FILED-USDC-CT-HARTFORD

STATE OF CONNECTICUT    :   **ss: CITY OF HARTFORD**

          :

COUNTY OF HARTFORD    :   **March 18, 2020**   3:00 mj 287 TOF

## MASTER AFFIDAVIT

I, Jeffrey Poulin, being duly sworn, depose and state the following:

### INTRODUCTION

1.  I have been a member of the Wethersfield, Connecticut, Police Department since 2003. From October 2011 to the present I have been assigned to the DEA's Hartford Resident Office ("HRO") as a TFO.

2.  During the course of my career, I have participated in numerous criminal investigations, including many investigations into suspected narcotics trafficking, money laundering and violations of firearms laws. My participation in the investigations has included: coordinating controlled purchases of narcotics using confidential informants, cooperating witnesses, and undercover law enforcement officers; coordinating the execution of search and arrest warrants, many of which have resulted in the seizure of narcotics, firearms and drug paraphernalia used in narcotics distribution; conducting electronic and physical surveillance, including the conduct of wiretap investigations; analyzing records related to narcotics trafficking; testifying in court proceedings; and interviewing informants and cooperating witnesses, many of whom are involved in drug distribution activity, and other members of law enforcement regarding the manner in which narcotics traffickers obtain, finance, store, manufacture, transport, and distribute controlled substances. I have participated in several investigations involving the use of court-authorized interception of wire and electronic communications, including text messages, as a case agent. My participation included monitoring the intercepted communications, surveillance related to intercepted communications, and

1

executing search and arrest warrants resulting from the intercepted communications and testimony in court proceedings

3.      I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), in that I am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516, offenses set forth in Title 21, United States Code and other federal felony offenses.

## REQUESTED WARRANTS & CRIMINAL COMPLAINTS

4.      This affidavit is submitted in support of criminal complaints and arrest warrants for Eduardo AGUILAR-LINARES ("AGUILAR"), Domingo GUZMAN, Jesus TORRUELLA, Felix CANCEL, Armando GONZALEZ, David CINTRON, Coraima SALGADO, Daniel ESTREMERA, Jonathan FALCON, Reinaldo COLON, Jr., Tomas ALERS, Jessica HOULE, Adam DELLABIANCA, Andrew DESROCHES, the unidentified male who uses 860-601-4027 (who is referenced herein as "UM4027") and the unidentified male who uses 929-513-2970 and is referred to as "Jay" (who is referenced herein as "JAY") on charges of conspiracy to possess with intent to distribute and to distribute controlled substances, in violation of 21 U.S.C. §§ 846 and 841(a)(1), and possession with intent to distribute and distribution of controlled substances, in violation of 21 U.S.C. § 841(a)(1).

5.      This affidavit is also submitted in support of applications for the issuance of search and seizure warrants for the following locations:

(a)      **Target Premises #1 - 365 Pearl Lake Road, Waterbury, CT** – is the residential address of Domingo GUZMAN.  The dwelling is a raised ranch-style residence that is white in color with green shutters and a green colored entry door.  The numerals "365" are

2

clearly displayed above the front entry door. Precision location data on 475-235-5522 and Target Telephone 3, in conjunction with physical surveillance, has revealed that GUZMAN resides at this address.

        (b)      **Target Premises #2 - 14 Prospect Street, 1st Floor, New Britain CT** – is the residential address of Armando GONZALEZ. The dwelling is a green colored, multi-family residence. The numerals "14" are clearly displayed on a placard that is centered above the front entry door. The front door of the residence faces west onto Prospect Street and the driveway of the residence is on the north side of the structure. Precision location data on **Target Telephone 1**, in conjunction with physical surveillance, has revealed that GONZALEZ resides at this address.

        (c)      **Target Premises #3 - 791 Center Street, Manchester, CT** – is the residential address of David CINTRON. The dwelling is a bright blue colored, single family residence located on the East side of Center Street. The numerals "791" are clearly displayed in white to the left of the front entry door. The structure is distinctive as it has solar panels on the front of the residence that are clearly visible from Center Street. Precision location data on **Target Telephone 2**, in conjunction with physical surveillance, has revealed that CINTRON resides at this address.

        (d)      **Target Premises #4 - 14 Judson Street, East Hartford, CT** – is the residential address of Daniel ESTREMERA. The dwelling is a single family residence located on the north side of Judson Street. The numerals "14" are clearly displayed in gold to the right of the main entry door. The siding of this residence is off white in color and the front entry door is maroon in color. Precision location data on 860-682-8578, in conjunction with physical surveillance, has revealed that ESTREMERA resides at this address. On multiple occasions,

vehicles registered to ESTREMERA were observed parked at this residence.  Further, on February 26, 2020, an investigator observed ESTERMERA departing the residence in one of these vehicles.

(e)    **Target Premises #5 - 387 Norfolk Road (Route 44), East Canaan, CT** – is a single family style residence.  The dwelling is wood shingled and brown in color.  The house is located on the east side of Route 44 and there is an industrial style garbage can that sits in the driveway of the home.  The numerals "387" are clearly displayed in black on the front of the residence, above a covered porch.  Based on surveillance, subscriber information, E-911 ping data and the use of a cell site simulator, UM4027 resides at this residence.

6.    I am one of the case agents who directed this investigation.  As a case agent, I am intimately familiar with the facts and circumstances of this investigation.  I was personally involved in the majority of the investigative activities undertaken during this investigation.  The facts set forth herein are based on, *inter alia*, my personal knowledge and participation in this investigation, information provided to me and other investigators by confidential sources[1], my review of court-authorized interceptions of wire and electronic communications, consensually monitored phone communications, arrests and interviews of members or associates of this drug trafficking organization (DTO), information that I obtained from public records, law enforcement databases and other reliable sources, information provided to me by other law enforcement officers, my analysis of police and investigative reports, and other information

which I have reviewed and determined to be accurate and reliable.  Because this affidavit is submitted for a limited purpose, I have not included each and every fact I know about this investigation.  I have set forth only those facts necessary to establish probable cause for the requested criminal complaints, arrest warrants and search warrants.

### RELEVANT FACTS

7.      Since July of 2019, the DEA HRO has been investigating a large-scale drug trafficking organization (DTO) that is distributing kilogram quantities of Fentanyl and heroin in Connecticut and surrounding states.  During this investigation, investigators have developed substantial evidence regarding this DTO through the use of numerous investigative techniques, including, *inter alia*, the following: controlled purchases of narcotics from members of this DTO; physical and electronic surveillance; consensually monitored and recorded phone calls with members of this DTO; court-authorized interceptions of phone calls and electronic communications (including text messages) over cell phones used by members of this DTO; warrants and orders authorizing the use of pen registers, E-911 data and cell site simulators; information provided by confidential sources[2], interviews of members and associates of this DTO; seizures of narcotics and narcotics proceeds from members of this DTO; arrests of members and associates of this DTO; searches of cell phones seized from members of this DTO;

---

[1] As discussed herein, investigators obtained information from five confidential sources (i.e., CS-1, CS-2, CS-3, CS-4 and CS-5).  Other investigators and I have determined that the information provided by these confidential sources is accurate and reliable.  Information provided by these confidential sources has been corroborated by, among other things, intercepted wire and electronic communications, physical surveillance, electronic surveillance, information provided by other confidential sources, arrests, seizures of narcotics and narcotics proceeds, search warrants, public records, police records, post-arrest admissions and other evidence.

and searches of locations used by members of this DTO.  This evidence has established the following:

## I.    OVERVIEW OF THE AGUILAR DTO.

8.    This DTO is run by Eduardo AGUILAR-LINARES ("AGUILAR") and members of AGUILAR's family, who reside in Mexico and Connecticut.  Significant members of the AGUILAR DTO include the following:

- **Eduardo AGUILAR-LINARES (AGUILAR)** is a leader of this DTO who currently resides in Mexico.  AGUILAR and his associates arrange for large quantities of narcotics (specifically, Fentanyl and heroin) to be sent to members of this DTO in Connecticut (i.e., GUZMAN, TORRUELLA and SARAGOSA), who, in turn, distribute the narcotics to large-scale narcotics traffickers in Connecticut and surrounding areas (i.e., GONZALEZ and CINTRON, ESTREMERA and COLON).  In addition, members of this DTO in Connecticut transfer large amounts of narcotics proceeds back to AGUILAR in Mexico.  See Part II, *infra*.

- **Domingo GUZMAN, Jesus TORRUELLA** and **Hugo SARAGOSA** are members of this DTO who live in Connecticut and conduct narcotics trafficking activities on behalf of and at the direction of AGUILAR.  During this investigation, GUZMAN, TORRUELLA and SARAGOSA all distributed narcotics and collected narcotics proceeds on behalf of AGUILAR.  See Part III (re: SARAGOSA), Part IV (re: TORRUELLA) and Part V (re: GUZMAN), *infra*.

- **Felix CANCEL** is a member of this DTO who coordinates or facilitates narcotics activities between AGUILAR and GONZALEZ.  See Part VI, *infra*.

- **Armando GONZALEZ** and **David CINTRON** are large-scale narcotics traffickers in Hartford, CT who are supplied with wholesale quantities of Fentanyl and heroin by AGUILAR and his associates (i.e., GUZMAN, TORRUELLA and SARAGOSA). **Coraima SALGADO** is GONZALEZ's girlfriend, who assists GONZALEZ with his narcotics trafficking activities. See Part VII, *infra*.

- **Daniel ESTREMERA** is a narcotics trafficker who obtains kilogram quantities of Fentanyl from AGUILAR and his associates (i.e., GUZMAN, TORRUELLA and SARAGOSA). **Joseph COTTO** maintained a narcotics mill on behalf of ESTREMERA at an apartment at 48 South Street in West Hartford, CT. See Part VIII, *infra*.

- **Jonathan FALCON** is a narcotics dealer, who distributes narcotics in the area of 25/27 Imlay Street in Hartford, CT. See Part IX, *infra*.

- **Reinaldo COLON, Jr.** is supplied with narcotics by AGUILAR and his associates. See Part X, *infra*.

- **Tomas ALERS** is an alternate source of supply of narcotics for GONZALEZ. See Part XI, *infra*.

- **Jessica HOULE, Adam DELLABIANCA** and **Andrew DESROCHES** are narcotics dealers who obtain resale quantities of Fentanyl from CINTRON. See Part XII, *infra*.

- **UM4027** supplies kilogram quantities of narcotics to members of this DTO in Connecticut. See Part XIII, *infra*.

- **JAY** is an unidentified male who is referred to as "JAY," who is in the New York City area and who uses phone number 929-513-2970. This investigation has revealed

7

that JAY is a money broker who is involved in laundering narcotics proceeds. See Part XIV,

*infra.*

## II.    EVIDENCE REGARDING AGUILAR

### A.    Background Information: AGUILAR's Criminal History.

9.      AGUILAR has a criminal history for narcotics offenses.  In May 2016,

AGUILAR was arrested by the DEA in the state of Connecticut based on a federal arrest warrant

from the U.S. District Court for the Eastern District of New York ("EDNY").  AGUILAR was

convicted in the EDNY of conspiracy to distribute Fentanyl and he was sentenced to 29 months

of imprisonment and 36 months of supervised release.  AGUILAR currently is on federal

supervised release.  AGUILAR's criminal history also shows an arrest by investigators from the

Department of Homeland Security (DHS) on May 7, 2019.  In August 2019, your affiant spoke

with an investigator from Homeland Security Investigations (HSI) who confirmed that

AGUILAR was stopped on or around May 7, 2019 and found to be in possession of a large

amount of suspected fentanyl.  The HSI agent advised that AGUILAR was arrested and released

from custody.  After his release, AGUILAR fled to Mexico.

### B.    Information from CS-1 regarding AGUILAR.

10.     Beginning in the summer of 2019, a confidential source ("CS-1") provided

information regarding Eduardo AGUILAR-LINAREZ (AGUILAR) and AGUILAR's DTO.  CS-

1 said that he/she was a member of the DTO, which was selling large amounts of Fentanyl and

heroin in Connecticut and surrounding areas.  CS-1 said that AGUILAR was a leader of this

DTO.  CS-1 said that AGUILAR lived at 86 Great Hill Road in East Hartford, CT until

approximately April or May 2019.  While living in Connecticut, AGUILAR distributed large

quantities of narcotics (specifically, Fentanyl and heroin) to large-scale narcotics traffickers.  CS-

8

1 said that AGUILAR was stopped by members of law enforcement in April or May of 2019, but released soon after.

11.    CS-1 said that after AGUILAR's release from custody, AGUILAR fled to Mexico. CS-1 said that after AGUILAR left Connecticut, AGUILAR had an associate named Hugo David SARAGOSA distribute Fentanyl and heroin in and around Connecticut on AGUILAR's behalf. In addition, SARAGOSA collected narcotics proceeds from associates in Connecticut and surrounding areas on behalf of this DTO. CS-1 said that SARAGOSA transported these narcotics proceeds to New York City so that the money could be laundered. As discussed in greater detail below, CS-1 provided significant information regarding AGUILAR and his associates providing wholesale quantities of Fentanyl and heroin to large-scale narcotics traffickers, which included Armando GONZALEZ and Daniel ESTREMERA.

C.    **Information from CS-2 regarding AGUILAR.**

12.    CS-2 said that AGUILAR was a leader of a DTO that was distributing large quantities of Fentanyl and heroin, and that was laundering large amounts of narcotics proceeds. AGUILAR is known by the alias "Vayo." AGUILAR previously resided in East Hartford, CT. AGUILAR was arrested by members of law enforcement and was bonded out at which time AGUILAR fled to Mexico. CS-2 provided two Mexican telephone numbers that were used by AGUILAR. CS-2 identified several photographs of Eduardo AGUILAR, a.k.a. "Bayo," from Facebook and indicated that AGUILAR was the person known to CS-2 as "Vayo." CS-2 said that AGUILAR was an associate of Felix CANCEL, who currently is incarcerated.

13.    CS-2 said that AGUILAR and his associates distributed kilograms of Fentanyl to large-scale narcotics traffickers in Connecticut and nearby areas. CS-2 distributed wholesale quantities of Fentanyl to Armando GONZALEZ, who worked with his brother, David

CINTRON, to distribute narcotics. CS-2 distributed two kilograms of Fentanyl to a narcotics trafficker in Hartford, CT who drove a black Acura MDX, who investigators believe to be Daniel ESTREMERA. CS-2 also distributed wholesale quantities of Fentanyl to a narcotics trafficker from the Boston, MA area. CS-2 said that AGUILAR used multiple couriers to deliver narcotics and collect narcotics proceeds. CS-2 described one courier that drove a white Jeep Cherokee, who investigators believe is Domingo GUZMAN. CS-2 said that AGUILAR and his associates were supplied with kilograms of Fentanyl from a Hispanic male in Canaan, CT, who investigators refer to as "UM4027."

**D.   The AGUILAR DTO's Money Laundering Activity.**

14.   As discussed above, AGUILAR's DTO is involved in laundering large amounts of narcotics proceeds. Members of this DTO in Connecticut collect narcotics proceeds from narcotics traffickers in Connecticut and surrounding areas, and then transport the narcotics proceeds (in the form of bulk cash) to New York so that the proceeds can be laundered and transferred to higher-level members of this DTO. During this investigation, investigators have seized narcotics proceeds from members of AGUILAR's DTO on multiple occasions, including the following (each of which are discussed in greater detail later in this Affidavit):

- On August 14, 2019, investigators seized approximately $14,960 in suspected drug proceeds from ESTREMERA.

- On August 28, 2019, investigators seized approximately $72,570 in suspected drug proceeds from ESTREMERA's associates.

- On July 9, 2019, investigators seized approximately $54,430 in suspected drug proceeds from Hugo David SARAGOSA.

- On October 10, 2019, investigators seized approximately $65,000 in suspected drug proceeds from AGUILAR's mother (Claudia LINARES) and AGUILAR's brother (Luis Ernesto AGUILAR-LINARES). Based on confidential source information and other information, investigators believe that Claudia LINARES and Luis AGUILAR-LINARES are members of the AGUILAR DTO.

15.     With regards to the $65,000 seized from Claudia LINARES and Luis AGUILAR, on October 8, 2019, another law enforcement agency advised your Affiant that a female using 860-840-5667 (who was later identified as AGUILAR's mother, Claudia LINARES) was arranging to conduct a money drop of drug proceeds in the New York City area. On October 10, 2019, investigators (including your Affiant) established surveillance in the area of the residence of Claudia LINARES and Luis AGUILAR at 82 Rood Ave, Windsor, CT. At approximately 8:57AM, investigators observed Luis AGUILAR exit the residence and place a duffel bag into a blue Jeep Cherokee that was parked in the driveway. Minutes later, Claudia LINARES exited the residence, and then LINARES and Luis AGUILAR left the area in the Jeep. As discussed above, LINARES is AGUILAR's mother and Luis AGUILAR is AGUILAR's brother.

16.     After observing a motor vehicle violation, a CT State Police officer conducted a motor vehicle stop of the Jeep. During the stop, a narcotics-detection K-9 alerted to the presence of a narcotics order on both the front driver's door and the front passenger's door. Investigators searched the Jeep and located approximately $65,000 in a black bag. After being advised of their *Miranda* rights, LINARES and Luis AGUILAR both said they were not the owner of the money. LINARES said that someone had asked her son, Luis AGUILAR, to deliver the money to New York. Luis AGUILAR said that he was asked by someone in Mexico to deliver the money to

New York. Luis AGUILAR indicated that he had retrieved the money from a Hispanic male in Hartford, CT approximately two days prior.

17. During the stop, investigators found the cell phone bearing telephone number 860-840-5667 in the black bag that contained the $65,000. LINARES acknowledged that this was her phone and consent to its search. A search of this phone revealed that LINARES had a Mexican telephone number saved in the device's contacts under the name "Eddy," who I believe to be her son, Eduardo AGUILAR-LINARES. LINARES's phone contained communications in which she referred to the user of the "Eddy" phone as "hijo," which translates to son. Moreover, LINARES's phone contained stored WhatsApp text communications during which LINARES and "Eddy" (believed to be AGUILAR) appear to discuss LINARES picking up drug proceeds and conducting the money drop that was scheduled for October 10, 2019.

### E.   Court Authorized Wiretaps.

18. On multiple occasions during this investigation, U.S. District Judge Robert Chatigny (and, on one occasion, U.S. District Judge Michael Shea) entered orders authorizing the interception of telephone calls and electronic communications (which include text messages) over the following three cellular phones: (1) cellular phone 860-970-2079 ("**Target Telephone 1**"), which was used by Armando GONZALEZ; (2) cellular phone 860-371-7614 ("**Target Telephone 2**"), which was used by David CINTRON and, on occasion, by GONZALEZ; and (3) cellular phone 203-394-1639 ("**Target Telephone 3**"), which was used by Domingo GUZMAN.[3]

---

[3] Investigators intercepted communications over **Target Telephone 1** between approximately November 14, 2019 and February 29, 2020, over **Target Telephone 2** between approximately January 14, 2020 and February 5, 2020, and over **Target Telephone 3** between approximately February 11, 2020 and February 17, 2020.

19.   Intercepted communications confirmed that GONZALEZ, CINTRON and

GUZMAN all are members of the AGUILAR DTO, and that AGUILAR is a leader of this DTO.

Intercepted communications revealed, among other things, that GONZALEZ and CINTRON are

large-scale narcotics traffickers in Hartford, CT, who are supplied with wholesale quantities of

Fentanyl and heroin by AGUILAR and AGUILAR's associates (i.e., GUZMAN, TORRUELLA

and SARAGOSA).  Investigators intercepted numerous communications during which

GONZALEZ and CINTRON discussed and arranged narcotics transactions with AGUILAR,

AGUILAR's associates and other narcotics traffickers.  In addition, intercepted communications

revealed, among other things, that GUZMAN distributes narcotics and collects narcotics

proceeds on behalf of AGUILAR.  Investigators intercepted numerous communications during

which GUZMAN discussed and arranged narcotics-related activity, including the delivery of

narcotics and conducting bulk currency pickups and drop-offs.

## III.   EVIDENCE REGARDING SARAGOSA

20.   As discussed herein, Hugo David SARAGOSA is a member of the AGUILAR

DTO who distributed Fentanyl and heroin in and around Connecticut to large-scale narcotics

traffickers (such as, Armando GONZALEZ and Daniel ESTREMERA) on AGUILAR's behalf.

In addition, SARAGOSA collected narcotics proceeds from associates in Connecticut and

surrounding areas on behalf of this DTO and transported these narcotics proceeds to New York

City so that the money could be laundered.

### A.   Seizure of Fentanyl, Heroin and $54,430 on 7/9/19.

21.   On July 9, 2019, DEA HRO investigators received information from another

DEA office regarding a narcotics trafficker and money launderer who was operating in East

Hartford, CT.  Through information provided by other DEA investigators and the ensuing

13

investigation, investigators identified this person as Hugo David SARAGOSA, who is a member of this DTO.

22.   On July 9, 2019, investigators observed SARAGOSA leave his apartment at 77 Glenn Road, East Hartford, CT while carrying a brown bag.  During a motor vehicle stop of SARAGOSA's car, investigators searched SARAGOSA's car.  While searching SARAGOSA's car, investigators seized approximately $54,430 from inside the brown bag that SARAGOSA had carried to his car.  Thereafter, investigators searched SARAGOSA's apartment at 77 Glenn Road, East Hartford, CT and seized approximately 1,997 grams (gross weight) of Fentanyl and 465 grams (gross weight) of heroin.  Investigators arrested SARAGOSA on narcotics trafficking charges.  On July 17, 2019, a federal Grand Jury in New Haven, CT returned an indictment charging SARAGOSA with federal narcotics offenses in United States v. Hugo David Saragosa, 3:19CR188 (AWT).[4]

   **B.**   **Search of SARAGOSA's Cell Phone.**

23.   In connection with the arrest of SARAGOSA, investigators seized SARAGOSA's cell phone.  Investigators searched SARAGOSA's phone and found text communications between SARAGOSA and GONZALEZ using 860-970-2079 (**Target Telephone 1**), during which SARAGOSA and GONZALEZ arranged narcotics trafficking activities.

24.   In addition, SARAGOSA's phone contained numerous drug-related communications between SARAGOSA's phone and Mexican telephone number 52-3541057887, which investigators believe was used by AGUILAR.  During these communications, the user of 52-3541057887 (AGUILAR) instructs SARAGOSA regarding the delivery of narcotics to

---

[4] Because SARAGOSA already has been arrested and the subject of a federal prosecution, I am

associates/customers and the collection of drug proceeds from associates/customers.

Investigators found numerous calls on SARAGOSA's phone during which AGUILAR and

SARAGOSA discuss, among other things, the quantity of narcotics in their possession, the

amount of narcotics distributed to associates/customers and the amount of drug proceeds

collected from their associates/customers.

## IV.    EVIDENCE REGARDING TORRUELLA

25.     As discussed herein, Jesus TORRUELLA is a member of this DTO who

distributed narcotics and collected narcotics proceeds on behalf of AGUILAR.

### A.    Surveillance of TORRUELLA on 1/4/20.

26.     During intercepted communications over **Target Telephone 1**, CANCEL

arranged for an unidentified associate (subsequently identified as TORRUELLA) to deliver

narcotics to GONZALEZ on January 4, 2020.  Based on the intercepted calls, it appeared that

TORRUELLA would deliver a half kilogram of narcotics in exchange for $12,000.  On January

4, 2020, investigators set up surveillance in the area of 22 Atwood Street Hartford, which was a

location used by GONZALEZ and CINTRON to mill and package narcotics.  Investigators

observed a person believed to be TORRUELLA carrying a white plastic shopping bag into 22

Atwood.  Shortly thereafter, TORRUELA exited 22 Atwood Street and left the area.

TORRUELLA drove to 34 Wilson Street and entered the building while carrying a black bag.

Toll records showed that TORRUELLA communicated with **Target Telephone 2** (which was

used by CINTRON and GONZALEZ) around the time that TORRUELLA went to 22 Atwood

Street.  In addition, toll records showed that TORRUELLA's phone communicated with numbers

known to be associated with CANCEL and AGUILAR.

not seeking an arrest warrant for SARAGOSA.

B.     **Intercepted Communications on 1/24/20.**

27.     During a series of communications between Domingo GUZMAN and Armando

GONZALEZ on January 23-24, 2020, GUZMAN told GONZALEZ to call AGUILAR. During a

later call on January 24, 2020, at approximately 2:51PM, GUZMAN explained to GONZALEZ

that AGUILAR is attempting to make contact with GONZALEZ. GONZALEZ told GUZMAN

that AGUILAR should call now. GUZMAN then said that he will tell AGUILAR to call now.

28.     At approximately 2:53PM, AGUILAR called GONZALEZ. GONZALEZ greets

AGUILAR as "Bayo," which is a known alias used by AGUILAR. AGUILAR explains that a

"much stronger" quantity of narcotics arrived and that it was already in Connecticut ("I already

have it there"). AGUILAR says that he wants GONZALEZ to try it and see if he likes it. I know

that during this investigation GONZALEZ had complained about the poor quality of the

Fentanyl previously received. Here, I believe that when AGUILAR says that he has something

"much stronger," AGUILAR is telling GONZALEZ that he has better quality narcotics (likely

Fentanyl) for GONZALEZ. AGUILAR and GONZALEZ then discuss Felix CANCEL being in

solitary confinement ("They took him to the hole yesterday"). (Note: due to CANCEL illegally

possessing and using a phone while in BOP custody, CANCEL was placed in solitary

confinement on or about January 23, 2020). GONZALEZ says that he sent a text to come

Tuesday "to pick up something" and then says "the only thing that's there are 12 pesos." Here,

GONZALEZ is referencing a text message that GONZALEZ sent to GUZMAN. Further,

GONZALEZ explains that he only has twelve thousand dollars to give to GUZMAN. AGUILAR

acknowledges and says that he was calling about the narcotics and not about the money (i.e.,

"tickets"). GONZALEZ then says that if the narcotics are good that it can be sold without

touching it or breaking it down and they can get the money quickly.

29.     I know from my training, experience, and participation in other investigations that milling and packaging kilogram quantities of Fentanyl for end user sales is an extremely time consuming task. For example, I know that one kilogram typically makes approximately forty thousand individual dose units and that the number of dose units or bags can be significantly increased depending on how much "cut" or additive is used. However, if distributors can sell quantities of Fentanyl in larger quantities, for example 100 gram amounts, it significantly reduces the amount of time needed to prepare the product for sale and enables distributors to sell the product much more quickly. During this same call, GONZALEZ says that his customers don't want to buy the current product because it doesn't hold two or one and a half, which is a reference to the amount of cut that can be mixed with the narcotics. GONZALEZ says that he will take the new product and again says that if it is good quality, he can sell it without breaking it down (i.e., "but if that holds that, I can let it go as is"). AGUILAR then says that TORRUELA is the person who has the new product ( "…the one that went that last time. The one that took the bad one"). GONZALEZ confirms by saying the "dark skinned one" (in reference to TORRUELLA) and AGUILAR acknowledges. AGUILAR and GONZALEZ then discuss how GONZALEZ should get the new product and whether it will be on January 24th or January 25th. AGUILAR inquires if GONZALEZ is interested in buying quantities of cocaine and GONZALEZ says that it depends on the quality and the price. GONZALEZ says that with cocaine "one can't make that much money" and "a lot of hassle for little money". The conversation ends shortly thereafter and AGUILAR states that he will call GONZALEZ about getting "one," which is a reference to a kilogram of the new product.

30.     On January 24, 2020 at approximately 3:30PM, AGUILAR called GONZALEZ. AGUILAR confirms that TORRUELLA will deliver the kilogram on January 24, 2020 and

GONZALEZ acknowledges. GONZALEZ asks if he should give TORRUELLA the money and AGUILAR acknowledges. GONZALEZ confirms and tells AGUILAR to have TORRUELLA go to the same place (i.e., Atwood Street) or have TORRUELLA call AGUILAR. AGUILAR acknowledges.

31.     On January 24, 2020 at approximately 3:44PM, TORRUELLA sent a text message to **Target Telephone 2** (GONZALEZ) that read "It's on behalf of vayo. Do you want me to take that to you at 6PM." Here, when TORRUELLA say "vayo," I believe that he is making reference to AGUILAR, who is referred to as "Bayo" or "Vayo". GONZALEZ in turn responds via text "ok, at the same place," which is a reference to 22 Atwood Street, Hartford, CT. TORRUELLA then acknowledges.

32.     On January 24, 2020 at approximately 5:54PM, **Target Telephone 2** sent a text message to TORRUELLA's phone that read "I'm here". Immediately after this text message, GONZALEZ mistakenly calls GUZMAN's phone. During this call, GUZMAN says, in substance, that AGUILAR never instructed him (GUZMAN) to deliver anything to GONZALEZ on that date and states that perhaps the other guy (TORRUELLA) is the one who is bringing the new product.

33.     Based on all of these intercepted communications, investigators believed that TORRUELLA was delivering one kilogram of narcotics to GONZALEZ on January 24, 2020.

**C.     Arrest of TORRUELLA and the Seizure
        of Over Three Kilograms of Fentanyl on 1/24/20.**

34.     On January 24, 2020, investigators established surveillance at 34 Wilson Street, Hartford, CT, which is an address associated with TORRUELLA.  At approximately 6:05PM, GONZALEZ over **Target Telephone 2** calls TORRUELLA and asks TORRUELLA if he is

18

close and TORRUELLA acknowledges. GONZALEZ then states that he (GONZALEZ) called

the other number and the other guy and says it was the "the one with the white truck," which is a

reference to GUZMAN. GONZALEZ and TORRUELLA joke about the mix-up and

TORRUELLA states that he will be there in ten minutes.

35.    Investigators observed TORRUELLA carry a bag to his Honda Pilot and drive in

toward Atwood Street. After observing a motor vehicle violation, Hartford Police Street Crimes

unit conducted a motor vehicle stop of TORRUELLA's Honda Pilot. TORRUELLA initially

stopped, however, after Hartford Police Officers began to approach TORRUELLA's Honda

Pilot, TORRUELLA departed at a high rate of speed. While approaching the Honda Pilot a

Hartford Police Officer was able to deploy a "stop stick" under a rear tire of the Honda Pilot,

which resulted in one rear tire being deflated. Investigators followed the Honda Pilot to the area

of Market Street and Talcott Street in Hartford, where the Honda Pilot crashed.

36.    After crashing, Hartford Police Officers observed TORRUELLA throw a

rectangular white colored block from the driver's side window. Seconds later, TORRUELLA

was detained without incident. Investigators retrieved the white colored block that

TORRUELLA had thrown from the Honda Pilot. A subsequent inspection of the white colored

block revealed that it was a compressed brick of suspected Fentanyl. The brick of Fentanyl had a

gross weight of approximately 1.6 kilograms. Investigators subsequently field tested a portion of

the substance which produced a positive result for Fentanyl. TORRUELLA was arrested on state

narcotics charges.

37.    After his arrest, TORRUELLA provided investigators with written consent to

search his apartment at 34 Wilson Street, Apartment B1, Hartford, CT.  During the search of this

apartment, investigators found two additional kilograms of suspected Fentanyl, a large amount of

loose white and brown powder, prepackaged amounts of suspected Fentanyl and narcotics

packaging and milling materials.

### D.    Search of TORRUELLA's phone.

38.    During the arrest of TORRUELLA, investigators seized a black flip style phone

from him.  TORRUELLA subsequently provided written consent to search this phone.  A search

of this phone uncovered text message communications between TORRUELLA and AGUILAR.

Within TORRUELLA's phone, AGUILAR was labeled as "Mex". During the text message

communications on TORRUELLA's phone, AGUILAR instructed TORRUELLA regarding the

delivery of narcotics on behalf of AGUILAR. During a text conversation, AGUILAR told

TORRUELLA to give one kilogram to "the dealer" (in reference to GONZALEZ) and a sample

of narcotics ("a photo") to his friend from Massachusetts, in reference to Reinaldo COLON, Jr.

During a further exchange, AGUILAR said, "Cousin, can you weigh them to see how much they

are with the clothes."  TORRUELLA responded, "Ok" and "1075.7 and the other 1063.0".

AGUILAR responded, "Ok thanks".  During this exchange, it appears that AGUILAR asked

TORRUELLA to weigh the two kilograms of Fentanyl (in their packaging) that TORRUELLA

had stashed at his residence at 34 Wilson Street.

## V.    EVIDENCE REGARDING GUZMAN

39.    As discussed herein, Domingo GUZMAN is a member of the AGUILAR DTO

who distributed narcotics (Fentanyl and heroin) to, and collected narcotics proceeds from, large-

scale narcotics traffickers (such as, Armando GONZALEZ, Daniel ESTREMERA and Reinaldo

COLON, Jr.) on behalf of AGUILAR.  During this investigation, investigators intercepted

numerous communications during which GUZMAN discussed and arranged narcotics-related

transactions.  Several examples of intercepted communications involving GUZMAN are discussed within this Affidavit.

### A.   Background Information: GUZMAN's Criminal History.

40.    GUZMAN was arrested by the DEA on June 20, 2006 in Bridgeport, CT for conspiracy to distribute cocaine and heroin, among other charges.  GUZMAN ultimately was convicted and sentenced to 188 months in prison and 60 months of supervised release. GUZMAN is currently on federal supervised release until August 25, 2024.  In addition, GUZMAN was arrested by the Bridgeport Police Department on July 9, 2003 for felony sale of narcotics and related charges.  GUZMAN was convicted and sentenced to 5 years jail, 1 year to serve, and 2 years of probation.

### B.   Surveillance of GUZMAN and ESTREMERA on 12/17/19.

41.    The investigation revealed that GUZMAN delivered wholesale amounts of Fentanyl to large-scale narcotics traffickers in Connecticut and surrounding areas, which included, among others, Daniel ESTREMERA and Armando GONZALEZ.  On multiple occasions, investigators observed GUZMAN meet with narcotics customers (such as, ESTREMERA and GONZALEZ), consistent with the evidence that GUZMAN supplied these customers with narcotics on behalf of AGUILAR.

42.    For example, on December 17, 2019, investigators observed GUZMAN drive from his residence at 365 Pearl Lake Road, Waterbury, CT (**Target Premises #1**) to 48 South Street, West Hartford, CT, which is a stash location used by Daniel ESTREMERA and Joseph COTTO.  [Note: as discussed below, on March 13, 2020, investigators seized over 1.5 kilograms of Fentanyl from a stash apartment at 48 South Street that was maintained by COTTO.]  While parked at 48 South Street, GUZMAN did not get out of his car or meet with anyone.  Shortly

21

thereafter, investigators observed GUZMAN drive to Rowe Avenue in Hartford, CT, where investigators observed Daniel ESTREMERA get into the passenger side of GUZMAN's Jeep. Based on electronic surveillance and observations of investigators, your Affiant and other investigators believe that ESTREMERA and GUZMAN were conducting a narcotics-related transaction.

### C.   Surveillance of GUZMAN and GONZALEZ on 1/30/20.

43.    On January 30, 2020, investigators intercepted a series of communications between GONZALEZ and CINTRON (using **Target Telephones 1 and 2**) and AGUILAR. During one text, AGUILAR says, "I am going to hand your number over to the ticket guy so he can go see you[,] the other guy that had the car had an accident and crashed the day he was going to see you[.]" Here, AGUILAR tells GONZALEZ that AGUILAR is going to pass GONZALEZ's number to someone who is going to pick up money ("the ticket guy"). AGUILAR then tells GONZALEZ that TORRUELLA ("the other guy") got in a car accident on the day that TORRUELLA was going to meet with GONZALEZ to deliver the kilogram of Fentanyl ("the car"). This is a reference to January 24, 2020, when investigators arrested TORRUELLA (who crashed his car) with a kilogram of Fentanyl that TORRUELLA was in the process of delivering to GONZALEZ.

44.    After **Target Telephone 1** sent some text messages to GUZMAN's phone without a response, **Target Telephone 1** sent a text to AGUILAR that said, "To which number[?] The guy you told me not to pick up the phone is the same one that is calling me[,] the same one that stole the 2,000 pesos. What happened with the skinny one". Here, GONZALEZ is reaching out to AGUILAR to clarify who GONZALEZ will be meeting with. I believe that "the skinny one" is a reference to TORRUELLA and that the "one who stole 2,000 pesos" is a

reference to GUZMAN.  Further, GONZALEZ's meeting later in the evening with GUZMAN

confirms that GUZMAN is the male who was referenced as the "one who stole 2,000 pesos".

45.     AGUILAR responded, "No[,] the one I told you not to answer is the one that was

going by for the bad car[.] The one who was missing two pesos[,] do it for this one so he can go

by for the tickets[.]And flaco crashed on the road[,] he had an accident".  Here, AGUILAR is

telling GONZALEZ that he wants GONZALEZ to meet with GUZMAN ("the one who was

missing two pesos") so that GUZMAN can collect the money. AGUILAR clarified that he did

not want GONZALEZ to meet with or answer for TORRUELLA, who was the one who

previously retrieved bad product from GONZALEZ ("the bad car") and again tells GONZALEZ

that TORRUELLA got in a car accident.

46.     GONZALEZ responded, "Okay[,] give me the number[.] I will call him after I get

out of the auction" and then AGUILAR sent GUZMAN's phone number to GONZALEZ.

During follow-up text messages, AGUILAR told GONZALEZ to let AGUILAR know how

much money GONZALEZ will be giving to GUZMAN.  During subsequent communications

between GONZALEZ and GUZMAN, they arranged to meet in the evening. GONZALEZ sent a

text to GUZMAN directing him to "410 s main st New Britain". During these communications, I

believe that GONZALEZ and GUZMAN were arranging to meet to conduct a money exchange,

during which GONZALEZ would provide GUZMAN with narcotics proceeds.

47.     GONZALEZ sent a text to AGUILAR that read "As soon as I get home I'm going

to give what I got here which is 13,000 I have 8 more to pick up in the street tomorrow or the

following day But I'm giving 13, now We are at 28 I have 8 in the street and the other 20 I will

have it for you this coming week." Here, GONZALEZ is telling AGUILAR that he is going to

give GUZMAN $13,000 in narcotics proceeds and GONZALEZ will have $28,000 in narcotics

proceeds ready for AGUILAR later in the week.

48.     At approximately 8:30PM, investigators established surveillance in New Britain,

CT. At approximately 8:46PM, investigators observed GONZALEZ leave his residence at 14

Prospect Street (**Target Premises #2**) while carrying a bag, enter a white BMW and leave the

area.  At approximately 8:54PM, GONZALEZ was parked a short distance away from 410 South

Main Street, (i.e., the address given to GUZMAN). Minutes later, an investigator observed a

GUZMAN's white Jeep Cherokee arrive to 410 South Main St and drive into the parking lot. At

approximately 8:59PM, GONZALEZ over **Target Telephone 1** received a call from GUZMAN.

During this call, GONZALEZ and GUZMAN are arranging to meet so that GONZALEZ can

provide narcotics proceeds to GUZMAN, who is acting at the direction of AGUILAR. At

approximately the same time, surveillance units observed the white Jeep Cherokee exit the lot of

410 South Main Street and proceed a short distance north.  At the same time, GONZALEZ was

observed exiting his BMW and walking toward South Main Street.  An investigator, who was

parked in front of GONZALEZ, could hear GONZALEZ speaking on the phone in real time with

GUZMAN.

49.     Investigators observed GONZALEZ enter the front passenger's side of

GUZMAN's Jeep Cherokee, which then pulled onto Buell Street and drove several feet toward

the west.  After several seconds, GONZALEZ exited GUZMAN's Jeep and walked back toward

his BMW.  Both GONZALEZ and GUZMAN then left the area.

50.     Beginning at approximately 9:10PM, GONZALEZ using **Target Telephone 1**

and AGUILAR engaged in a text message conversation.  In sum, AGUILAR asked GONZALEZ

to confirm when he met GUZMAN and how much was provided.  In sum, GONZALEZ

24

responded that they already met and GONZALEZ provided "13," which is a reference to thirteen

thousand dollars in narcotics proceeds. During the above interaction, I believe that GONZALEZ

provided GUZMAN with $13,000 in narcotics proceeds.

**D.     Surveillance of GUZMAN and GONZALEZ on 2/11/20.**

51.     On February 10-11, 2020, investigators intercepted communications during which

GONZALEZ using **Target Telephone 1** arranged to meet GUZMAN on February 11, 2020 to

provide GUZMAN with narcotics proceeds on behalf of AGUILAR.

52.     On February 11, 2020, investigators observed GONZALEZ walk from the area of

his residence at 14 Prospect Street and enter the passenger side of CINTRON's BMW.  At

approximately 6:56 pm, investigators intercepted a text communication from GONZALEZ to

GUZMAN that read "Go in to the car wash."  GUZMAN replied via text "Ok".  At

approximately 7:02 pm, investigators observed the CINTRON's BMW enter the lot at City Gas

at 453 South Main St., New Britain, CT and park.  At approximately 7:06 pm, investigators

intercepted a text from GONZALEZ to GUZMAN that read "How long until your here?"

GUZMAN replied via text "6".  At approximately 7:07 pm, investigators observed CINTRON's

BMW enter the New Britain Auto Wash located at 392 South Main St where it parked in the bay

near the middle of the car wash.  An investigators then observed CINTRON exit the driver's side

and begin hosing down the BMW. At approximately 7:10 pm, investigators intercepted a text

from AGUILAR to GONZALEZ asking, "Hello, how are you?" and GONZALEZ replied,

"I gave (him) 14800."

53.     At approximately 7:13 pm, investigators observed GUZMAN's white Jeep

Cherokee enter the car wash and drive toward the rear of the car wash lot. Investigators

observed GONZALEZ, who was carrying a bag, approach a male who was standing next to the

Jeep Cherokee. The male placed the bag in the passenger area of the Jeep. Investigators then observed GONZALEZ walk back to CINTRON's BMW as CINTRON's Jeep drove toward the front of the car wash. Due to low light conditions in the area of the lot where the bag exchange took place, investigators could not provide a more detailed description of the male who received the bag from GONZALEZ. Based upon GUZMAN's use of the white Jeep Cherokee, intercepted communications and precision location information with regard to GUZMAN's phone (which placed GUZMAN at the car wash), investigators believe that GUZMAN was the male with whom GONZALEZ met.

54.     Based on the above-described evidence, I believe that GONZALEZ provided GUZMAN with $14,800 in narcotics proceeds. Additionally, I believe that GONZALEZ likely keeps quantities of narcotics proceeds at his residence, 14 Prospect Street, 1st Floor, New Britain, CT, as he was observed leaving this location just prior to conducting money drops to GUZMAN on January 30, 2020 and February 11, 2020.

## VI.     EVIDENCE REGARDING CANCEL

55.     This investigation has revealed that CANCEL is a member of this DTO who coordinates or facilitates narcotics activities between AGUILAR and GONZALEZ.

### A.     Background Information: CANCEL's Criminal History.

56.     As a result of an investigation involving court-authorized wiretap interceptions of CANCEL in the District of Connecticut in 2006 and 2007, CANCEL was prosecuted in the District of Connecticut. CANCEL pled guilty to Count One of the indictment in United States v. Felix Cancel, et al., 3:07CR58 (AWT) charging him with conspiracy to distribute a kilogram or more of heroin and Count One of the information in United States v. Felix Cancel, 3:07CR240 (AWT) charging him with engaging in monetary transactions involving $10,000 or more of

26

funds derived from the unlawful distribution of controlled substances.  On May 16, 2008, U.S.

District Court Judge Alvin W. Thompson sentenced CANCEL to 240 months in prison on Count

One of the indictment and 120 months in prison on Count One of the information, to be served

concurrently.  CANCEL currently is serving this prison sentence at FCI Berlin in New

Hampshire.

### B.   Communications between GONZALEZ and CANCEL.

57.   On December 19, 2019 at approximately 6:39PM, GONZALEZ using **Target
Telephone 1**, received an incoming call from Felix CANCEL, who is currently incarcerated at

FCI Berlin in New Hampshire. During this call, GONZALEZ tells CANCEL that the police

grabbed his "boy" (CINTRON) yesterday, referring to the arrest of CINTRON on December 18,

2019. When GONZALEZ tells CANCEL to tell "those people not to call those phone, because

they took the phones away from him," I believe that GONZALEZ is telling CANCEL for their

narcotics trafficking associates (i.e., AGUILAR and his associates) not to call CINTRON's

phones because the police seized CINTRON's phones. CANCEL acknowledges. GONZALEZ

says that he hasn't' finished yet.  Here, I believe that GONZALEZ is telling CANCEL that he

hasn't finished milling/packing the narcotics.  GONZALEZ says "I told him to come pickup

something on Sunday or Monday" and CANCEL says "Okay, I tell him/them."  Here, when

GONZALEZ says "pickup," I believe GONZALEZ is talking about money.  Later in this call,

CANCEL asks about CINTRON (i.e. "but is the kid alright?"). GONZALEZ says that he bailed

CINTRON out and CANCEL says that it wasn't that much anyway, a suspected reference to the

quantity of narcotics seized from CINTRON. GONZALEZ says that it was 50 packs and 90

grams and "that's it". As discussed above, Officers seized from CINTRON approximately 4860

wax folds (i.e., approximately 48.6 packs or stacks) of suspected Fentanyl and 90 grams of

suspected Fentanyl. GONZALEZ says that it was a regular traffic stop and that CINTRON did

not have a license. GONZALEZ then says "but everything is all right, anyway. But they don't

have to worry about nothing [UI]" and CANCEL says "okay, all right. I'll tell them." Here, I

believe that GONZALEZ is telling CANCEL that the other members of the DTO don't have

anything to worry about despite CINTRON's stop. GONZALEZ again says to tell "them" not to

call those phones, likely a reference to CINTRON's phones. GONZALEZ says that "he," likely a

reference to CINTRON, had Whatsapp on those phones and says not to use Whatsapp anymore.

CANCEL acknowledges and says that he will tell them right now and call GONZALEZ back.

GONZALEZ then tells CANCEL that he is also going to buy a new phone and give CANCEL

the number. CANCEL says "yes, but he has to change the phone number anyway right?" and

GONZALEZ replies "yes, just in case. You know, you never know." Here, I believe that

GONZALEZ is telling CANCEL that regardless of the fact that GONZALEZ is getting a new

phone, CANCEL should tell their associate (AGUILAR) to also change his phone number.

58.     On December 19, 2019 at approximately 6:52PM, GONZALEZ using **Target**

**Telephone 1**, received an incoming call from CANCEL. In this call, CANCEL tells

GONZALEZ that "he" (AGUILAR) is going to change his number right now. Later in the call,

CANCEL again asks about the "kid" (which is a reference to CINTRON) and asks if he will be

alright. GONZALEZ replies that will be fine ("he knows what's going on") and then says "but

remember that no one know about nothing only us, you understand." Here, I believe that

GONZALEZ is telling CANCEL that only GONZALEZ and CANCEL know about the structure

of the DTO and possibly CANCEL's involvement. CANCEL says that he knows and says he

was asking how CINTRON will fare. GONZALEZ tells CANCEL that CINTRON will likely do

18 months in jail. CANCEL then says that if CINTRON does do time, "at least he'll be sent over

here so I can take care of him," which is a reference to CINTRON going to the same correctional facility where CANCEL is currently incarcerated. GONZALEZ then tells CANCEL that it is state charges. CANCEL says they have to see if the "other people will grab it/him," which is a reference to the members of Federal Law Enforcement taking CINTRON's case, likely because CINTRON's case involved Fentanyl. GONZALEZ attempts to quell CANCEL's fears that the case will be adopted by Federal Law Enforcement by telling CANCEL that there isn't regular heroin on the street anymore and everything is Fentanyl ("One doesn't see of the other ones anymore. That's all there is"). GONZALEZ says that a lot of people have been prosecuted on Fentanyl charges ("So, everyone has those cases already"). They then talk about the legality of the stop and search. The conversation ends shortly thereafter.

59.     On December 20, 2019, **Target Telephone 1**, used by GONZALEZ, received a text message from CANCEL's phone that read "3541206665 this is the new number."  I know from my training and experience, as well as my participation in this investigations, that the number sent by CANCEL is a Mexico exchanged number. I know that "354" represent the area code for Michoacán, Mexico, where AGUILAR is from. Further, since the initiation of this investigation in July of 2019, I have identified numerous telephone numbers used by AGUILAR, all of which had the "354" area code.

60.     On December 22, 2019 at approximately 2:18PM, **Target Telephone 1**, used by GONZALEZ, received a text message from CANCEL's phone that read "The number that I sent you is Bayo's new number."  In a follow up text message, GONZALEZ apologized and acknowledged receipt of the text ("My bad I was in the store yea I got it"). CANCEL in turn told GONZALEZ to call him (CANCEL) when he can. I believe that this text conversation is a

follow-up to the December 20, 2019 text message from CANCEL that read "3541206665 this is the new number." In addition, investigators know that "Bayo" is an alias used by AGUILAR.

C.   **Pertinent communications on 12/23/19.**

61.   On December 23, 2019 at approximately 4:35PM, GONZALEZ using **Target Telephone 1**, received an incoming call from CANCEL. During this call, CANCEL asks GONZALEZ if he received the number for AGUILAR that CANCEL had previously sent. CANCEL also asks if GONZALEZ has called AGUILAR. GONZALEZ acknowledges that he received the number, but that he has not called AGUILAR yet. GONZALEZ indicates that he has not bought a new "dirty phone" yet. GONZALEZ indicates that he will call AGUILAR when he gets to his brother's house, which is a reference to CINTRON. CANCEL and GONZALEZ then talk about a vehicle that GONZALEZ is fixing for CANCEL. CANCEL again tells GONZALEZ to call AGUILAR. GONZALEZ acknowledges and again affirms that he will call AGUILAR when he arrives to CINTRON's house in one or two hours. CANCEL then asks if GONZALEZ's phone will be available and GONZALEZ tells CANCEL that he can call GONZALEZ on **Target Telephone 1**

62.   On December 23, 2019 at approximately 6:47PM, GONZALEZ using **Target Telephone 1** made an outgoing call to CANCEL. During this call, GONZALEZ said, in part, "Send me the number again" and CANCEL responded, "Okay. [Pause] I'll send it now." In response to this call, CANCEL sent GONZALEZ a text message over **Target Telephone 1** that read "354 120 6665". As described above, this number was previously passed to GONZALEZ by CANCEL and was determined to be the new telephone number used by AGUILAR.

63.   On December 23, 2019 at approximately 6:51PM, GONZALEZ, using **Target Telephone 1**, made an outgoing call to CANCEL. During this call, GONZALEZ says that his

phone cannot call outside (possibly, an international number). CANCEL tells GONZALEZ to give the phone number to CANCEL and CANCEL will have their associate (i.e., AGUILAR) call GONZALEZ. GONZALEZ says that he will send the phone number via text message. At approximately 6:51PM, GONZALEZ, using **Target Telephone 1,** sent a text message to CANCEL's phone that read "8603717614". These are the digits for **Target Telephone 2.**

64.     On December 23, 2019 at approximately 6:57PM, CANCEL's phone sent a text message to GONZALAEZ over **Target Telephone 1** that read "He's going to call now". Toll data revealed that on December 23, 2019 at approximately 6:58PM, **Target Telephone 2** received an incoming call from AGUILAR using 52-3541206665. During this call, I believe that AGUILAR called GONZALEZ and/or CINTRON over **Target Telephone 2** to discuss their narcotics-trafficking activities. The duration of this call was approximately two minutes and fifty four seconds.

## VII.   EVIDENCE REGARDING GONZALEZ, CINTRON & SALGADO

65.     This investigation has revealed that Armando GONZALEZ (and GONZALEZ's close associate, David CINTRON) are large-scale narcotics traffickers in Hartford, CT, who are supplied with wholesale quantities of Fentanyl and heroin by AGUILAR and AGUILAR's associates (i.e., GUZMAN, TORRUELLA and SARAGOSA).  CINTRON is essentially GONZALEZ's right-hand-man.  CINTRON assists GONZALEZ with, among other things, acquiring, stashing, processing, packaging and distributing narcotics.  Coraima SALGADO is GONZALEZ's live-in girlfriend.  Based on intercepted communications, SALGADO and GONZALEZ discuss all aspects of GONZALEZ's narcotics trafficking activities.  In addition, intercepted communications reveal that SALGADO assists GONZALEZ with his narcotics trafficking activities.

31

### A.     Background Information: GONZALEZ's Criminal History.

66.     GONZALEZ previously was the target of a DEA investigation in 2011.  On July 1, 2011, DEA investigators in Hartford, CT arrested GONZALEZ for possession of a firearm by a convicted felon, possession of a firearm in furtherance of a drug trafficking offense and possession with intent to sell heroin and marijuana.  On October 11, 2011, GONZALEZ pled guilty to possession of a firearm by a prohibited person in the U.S. District Court for the District of Connecticut and he was sentenced to 37 months imprisonment and 24 months of supervised release.  GONZALEZ has criminal convictions in Connecticut state court for criminal possession of a gun, assault 2, larceny 1 and evading responsibility.  GONZALEZ is a known member of the Latin Kings gang.  In 2011, investigators from the Hartford Police Department located a publicly accessible Facebook page for GONZALEZ, which contained photographs of GONZALEZ showing Latin King hand signals, of GONZALEZ with a handgun in his waistband and photographs with captions or comments that reference the Latin Kings.

### B.     Information from CS-1 regarding GONZALEZ.

67.     CS-1 said that Armando GONZALEZ was a large-scale Fentanyl distributor in Hartford, who obtained narcotics from AGUILAR and his associates.  CS-1 said that GONZALEZ went by the nickname "Top Boy".  CS-1 said that GONZALEZ would purchase approximately 500 grams of Fentanyl from AGUILAR every two weeks.  CS-1 described GONZALEZ as a light skinned Hispanic male with a muscular build and tattoos on both arms.  CS-1 said that GONZALEZ rented two floors in a building located on Pratt Street, which investigators identified as 57 Pratt St, Hartford, CT.  CS-1 described 57 Pratt Street as some type of music studio.  CS-1 said that GONZALEZ is associated with a car dealership (i.e., Primetime Auto) that is located by the water in New Haven, CT.  CS-1 said that GONZALEZ assisted

AGUILAR and his associates with registering vehicles.  CS-1 said that GONZALEZ used

telephone number 860-970-2079 (**Target Telephone 1**) to communicate regarding narcotics

trafficking activities.

      **C.**    **Information from CS-2 regarding GONZALEZ & CINTRON.**

      68.    CS-2 said that AGUILAR and his associates distributed kilograms of Fentanyl to

large-scale narcotics traffickers in Connecticut and nearby areas, which included Armando

GONZALEZ.  CS-2 advised that CS-2 distributed wholesale quantities of Fentanyl to Armando

GONZALEZ.  CS-2 said that Armando GONZALEZ worked with David CINTRON to

distribute narcotics.  CS-2 described CINTRON as GONZALEZ's brother.  CS-2 said that

GONZALEZ was an associate of Felix CANCEL.  When CS-2 delivered Fentanyl to

GONZALEZ (and CINTRON), CS-2 delivered the Fentanyl to an apartment building near St.

Franics Hospital in Hartford, CT.  CS-2 described the apartment building, which was consistent

with 22 Atwood Street, Hartford, CT.  CS-2 advised that on one occasions, CS-2 delivered a half

kilogram of Fentanyl to GONZALEZ and, at the same time, retrieved a half kilogram of

Fentanyl that GONZALEZ complained was of poor quality.

      **D.**    **Information from CS-3 regarding GONZALEZ & CINTRON.**

      69.    During the month of October 2019, a confidential source ("CS-3") provided

information regarding Armando GONZALEZ and David CINTRON, a.k.a. "City."  CS-3 said

that Armando GONZALEZ, who CS-3 knew as "Mando," is a large-scale distributor of Fentanyl

in the Hartford, CT area.  CS-3 sent to investigators Facebook screenshots of GONZALEZ.  CS-

3 said that GONZALEZ is affiliated with the "5[th] Floor Podcast Room" which is located on Pratt

Street in Hartford, CT.  CS-3 said that GONZALEZ is also affiliated with Primetime Auto in

New Haven, CT and may have some type of ownership stake in the business.  CS-3 said that in

the past, CS-3 received 100 and 200 gram quantities of Fentanyl from GONZALEZ in the Hartford area. CS-3 said that GONZALEZ has asked CS-3 for large quantities of Fentanyl, when GONZALEZ was in need of narcotics. Investigators obtained consent from CS-3 to view the CS-3's phone, which contained text communications between CS-3 and GONZALEZ regarding large-scale narcotics trafficking activities.

70. CS-3 also provided investigators with information regarding GONZALEZ's main "runner," who CS-3 knows by the nickname "City". CS-3 said that "City" is a Hispanic male with a tattoo above his left eye. CS-3 provided investigators with a photograph of GONZALEZ and "City." Investigators immediately recognized the photograph of "City" to be David CINTRON.

### E.   Information from CS-4 regarding GONZALEZ & CINTRON.

71. In June of 2019, members of the DEA HRO met with an Inspector Jeremy Tendler from the U.S. Postal Inspection Service (USPIS), who provided information obtained from a USPIS confidential source ("CS-4"). Inspector Tendler advised that CS-4 previously purchased large quantities of packaged heroin/fentanyl from a Hispanic male with the nickname "Dopeboy." CS-4 later identified a photograph of Armando GONZALEZ as the narcotics trafficker known to CS-4 as "Dopeboy." CS-4 said that GONZALEZ rents space on the 4th and 5th floors of 57 Pratt Street, Hartford, CT and conducts drug-related business at this location. CS-4 said that GONZALEZ has a recording studio in the space that he (GONZALEZ) rents at 57 Pratt Street. CS-4 said that GONZALEZ is involved in music promotions and nightclubs. CS-4 indicated that the owner of a business called Primetime Auto Sales and Repair LLC ("Primetime Auto") in New Haven, CT was an associate of GONZALEZ. CS-4 provided Inspector Tendler with a mobile phone number used by GONZALEZ.

72.    CS-4 said that GONZALEZ distributed significant quantities of heroin and/or fentanyl. In early October 2019, CS-4 provided Inspector Tendler with a photograph of a Hispanic male, who CS-4 described as GONZALEZ's "runner". Investigators recognized this Hispanic male to be David CINTRON, who is a light sinned Hispanic male with a prominent facial tattoo located on his left eyebrow. Prior to CS-4's arrest, he/she only dealt with GONZALEZ (i.e., obtained narcotics from GONZALEZ) a few times. CS-4 stated that CINTRON was always present during his/her dealings with GONZALEZ. CS-4 stated that he dealt with GONZALEZ on the 5th Floor at 57 Pratt Street.

### F.    Interceptions involving GONZALEZ and CINTRON.

73.    As discussed above, investigators intercepted communications over **Target Telephone 1** (which was used by GONZALEZ) between approximately November 14, 2019 and February 29, 2020, and investigators intercepted communications over **Target Telephone 2** (which was used by CINTRON and, on occasion, by GONZALEZ) between approximately January 14, 2020 and February 5, 2020. Investigators intercepted numerous communications during which GONZALEZ and CINTRON discussed and arranged narcotics transactions with members of this DTO and other narcotics traffickers. Numerous examples of intercepted communications involving GONZALEZ and/or CINTRON are discussed throughout this affidavit.

### G.    Seizure of Fentanyl and Arrest of CINTRON on 12/18/19.

74.    On December 18, 2019, beginning at approximately 5:04PM, GONZALEZ, using **Target Telephone 1**, exchanged a series of text messages with SALGADO indicating that GONZALEZ was at 57 Pratt Street. During the investigation, your Affiant and other

investigators developed evidence that 57 Pratt Street is a location used by GONZALEZ and CINTRON to conduct narcotics activities.

75.    At approximately 5:52PM, GONZALEZ, using **Target Telephone 1,** exchanged the following text messages with SALGADO:

SALGADO:   When are u gonna be done

GONZALEZ: Not that long I already did a box 2 more and I'm done

GONZALEZ: So like a hour and a half the longest

GONZALEZ: I'm flying threw this

SALGADO:   Ok

76.    Based on this conversation, investigators suspected that GONZALEZ was milling and packaging narcotics at 57 Pratt Street. I know from my training, experience and participation in other narcotics investigations that a "box" is a reference to 500 wax folds (i.e., 5 stacks) of Fentanyl or heroin. The term "box" refers to the cardboard boxes that hold the empty wax folds or sleeves that are used to package Fentanyl or heroin in this region. Each of these cardboard boxes typically hold 600 empty wax folds. When the wax folds are filled with Fentanyl or heroin, a box holds 500 wax folds.

77.    At approximately 7:52PM, GONZALEZ using **Target Telephone 1** made an outgoing call to SALGADO, using 860-604-1257. GONZALEZ and SALGADO discussed, in part, the following:

GONZALEZ:       What you doing?

SALGADO:        Nothing, I'm right here. Um…trying to get some food for the kids and then that's it. And then leave…bout to leave pretty soon.

GONZALEZ:       Okay. Well I'm doin my last twenty so we should be done around the same time

| SALGADO: | Your last what? |
|---|---|
| GONZALEZ: | My last twenty. |
| SALGDAO: | Twenty? You're going to be done in like two hours. What you talking about? |
| GONZALEZ: | No, cause I'll do… I'll do half and City is doing half. So that's an hour baby. |
| SALGADO: | Oh like and hour? Okay |
| GONZALEZ: | Yeah. |
| SALGADO: | Okay well that's fine. |

78.    In this conversation, when GONZALEZ says "I'm doin my last twenty," I believe that GONZALEZ is milling and packing narcotics and GONZALEZ is telling SALGADO that he is working on his last twenty grams. I know from my training, experience and participation in other narcotics investigations that raw amounts of narcotics are often referred to numerically (i.e., "10" for ten grams, "20" for twenty grams, etc.). GONZALEZ tells SALGADO that the last twenty (20) should take about an hour to complete, but SALGADO disagrees and tells GONZALEZ that he is underestimating the time it will take ("Twenty? You're going to be done in like two hours. What you talking about?"). I also know from my training, experience and participation in other narcotics investigations that the milling and packaging of narcotics, specifically heroin/Fentanyl, is a tedious process that takes a significant amount of time. For example, I know that twenty grams of heroin/Fentanyl, depending on how it is being processed and assuming no additional cutting agents are added to the twenty grams, will fill approximately 800 individual wax folds. Additionally, during this call GONZALEZ indicates that he is with "City", which investigators know is a reference to CINTRON. GONZALEZ indicates that

CINTRON is helping with the milling and packaging of the narcotics ("No, cause I'll do… I'll do half and City is doing half. So that's an hour baby")

79. At approximately 9:16PM, GONZALEZ using **Target Telephone 1** sent SALGADO a text message indicating that he was done and that he was about to leave. At approximately 9:25PM, an investigator observed both GONZALEZ and CINTRON exit 57 Pratt Street. This investigator observed that CINTRON was carrying a backpack. GONZALEZ and CINTRON got into separate vehicles. CINTRON drove away in a blue Toyota 4 Runner. After observing a motor vehicle violation, a Hartford Police Department marked unit initiated a stop of CINTRON's Toyota. CINTRON was the driver and sole occupant of the Toyota. During the stop, officers searched CINTRON's Toyota and found a large amount of narcotics, along with narcotics milling and packing materials, within the backpack that investigators observed CINTRON out of from 57 Pratt Street.

80. In total, the officers seized from CINTRON's backpack the following evidence: approximately 4,860 blue wax paper sleeves filled with suspected Fentanyl; approximately 90 grams of a suspected Fentanyl; a black digital scale; 1 tooth brush with white powder residue; 6 plastic straws with residue; three brown cardboard boxes containing numerous empty blue wax sleeves; one wooden pestle; a blender; numerous rubber bands; and an opened package of Mannite, which is commonly used as a cutting agent for heroin/Fentanyl. Investigators also seized two cellular telephones from CINTRON. Investigators subsequently conducted field tests on portions of the powdered substance from one of the blue wax sleeves and from the 90 grams of compressed white powder. Both tests returned a positive results for the presumptive presence of Fentanyl. CINTRON was arrested and charged with state narcotics offenses and state traffic violations. CINTRON posted bond and was released from custody.

### H.    SALGADO assists GONZALEZ with his Narcotics Trafficking.

81.    As discussed above, SALGADO lives with GONZALEZ.  Based on intercepted communications, GONZALEZ discusses all aspects of his narcotics trafficking with SALGADO. In addition, intercepted communications reveal that SALGADO assists GONZALEZ with his narcotics trafficking activities.  For example, as discussed herein, during intercepted communications on December 18, 2019 before the arrest of CINTRON, GONZALEZ told SALGADO that GONZALEZ and CINTRON were at 57 Pratt Street bagging up the last 20 grams of Fentanyl.  SALGADO and GONZALEZ argued about how long it would take GONZALEZ to bag up this Fentanyl.

82.    As another example, after Tomas ALERS was arrested on February 25, 2020 while ALERS was driving to bring narcotics to GONZALEZ at 22 Atwood Street, GONZALEZ told SALGADO about the arrest.  GONZALEZ also told SALGADO that he (GONZALEZ) grabbed all of the large amounts of narcotics and left their stash location at 22 Atwood Street (i.e., due to GONZALEZ's concern that that ALERS might cooperate with law enforcement and direct the police to 22 Atwood Street).  During this call, GONZALEZ and SALGADO had the following exchange:  GONZALEZ: ". . . . Fuck this bullshit. We can't work here. I don't feel safe right here."  SALGADO: "Um... if anything ya'll could do it in the baby's room, lock the doors do it in the baby's room."  GONZALEZ: "I don't know if Tommy know where we live at over here [Voices Overlap]."  SALGADO: "Tommy don't know where we live at. He knows Albin[PH] street. He don't know this house."  During this exchange, GONZALEZ says that he does not feel safe with the narcotics at 22 Atwood Street and SALGADO tells GONZALEZ that he can process and package the narcotics in their baby's room with the door locked.  In addition,

39

SALGADO assures GONZALEZ that ALERS does not know where they (SALGADO and GONZALEZ) live.

83.     During another call, SALGADO asked GONZALEZ where the gun was. Specifically, the discussed the following: SALGADO: "Where that gun at dog? I don't find it." GONZALEZ: "It's not in the bag. If it's not in the bag it's in my book bag." SALGADO: "Do you got the book bag with you?" GONZALEZ: "Oh, yeah. I do have it. [Chuckles]" SALGADO: "Okay, bye then." GONZALEZ: "Bye."

84.     During another call, GONZALEZ was complaining to SALGADO about the Mexicans collecting narcotics proceeds from him and GONZALEZ asks for advice from SALGADO about what he should do. During this call, they discuss, in part, the following: GONZALEZ: "I don't know. I'm asking City, what he want to do. Cause at the end of the day, I'm still gonna keep some money. I'm not giving him everything. [Pause] I'll probably just keep like another two (2) G's. I don't give a fuck. [Chuckles / Laughs]." SALGADO: "Mmm... [Voices Overlap]." GONZALEZ: "What you think?" SALGADO: "I mean, if you saying they hot like that. I mean, I'd stop fucking with them and burn 'em [Chuckles]."

## VIII.   EVIDENCE REGARDING ESTREMERA & COTTO

85.     The investigation revealed that Daniel ESTREMERA regularly obtained wholesale quantities, including kilogram quantities, of Fentanyl from AGUILAR and his associates (i.e., GUZMAN, TORRUELLA and SARAGOSA). Throughout this investigation, ESTREMERA has lived at 14 Judson Street, East Hartford, CT and ESTREMERA has used multiple cell phones to facilitate his narcotics trafficking activities. Joseph COTTO maintained a narcotics mill (i.e., a location to stash, process, package and, on occasion, distribute narcotics) on behalf of ESTREMERA at an apartment at 48 South Street in West Hartford, CT. In addition,

ESTREMERA and FALCON are close associates, who appeared to maintain narcotics at, and distribute narcotics in the area of, 25/27 Imlay Street in Hartford, CT.

### A.   Background Information regarding ESTREMERA.

86.   ESTREMERA is known to DEA investigators as being a high-level narcotics trafficker.  In 2007, ESTREMERA was arrested by the DEA New Haven District Office for conspiracy to distribute heroin.  This prior investigation revealed that ESTREMERA was obtaining large quantities of heroin from Felix CANCEL and his drug trafficking associates. ESTREMERA pled guilty to conspiracy to distribute one kilogram or more of heroin.  On or about February 11, 2009, U.S. District Judge Alvin W. Thompson sentenced ESTREMERA to 120 months in prison and 8 years of supervised release.  On or about March 22, 2018, ESTREMERA was released from federal incarceration and started his 8-year term of supervised release.  ESTREMERA currently is on federal supervised release.

### B.   Information from CS-1 regarding ESTREMERA & COTTO.

87.   CS-1 provided information regarding Daniel ESTREMERA, who CS-1 identified as a high-level narcotics distributor operating in Hartford, CT.  CS-1 knew ESTREMERA as "Matatan".  As discussed below, CS-1 subsequently identified a photograph of Daniel ESTREMERA as the person who CS-1 knew as "Matatan."  CS-1 said that since approximately May of 2019, CS-1 had provided ESTREMERA with multiple kilograms of Fentanyl.

88.   CS-1 described ESTREMERA as a Hispanic male in his early forties.  CS-1 provided a physical description of ESTREMERA.  CS-1 said that ESTREMERA operated an older red sedan with heavy tints as well as a newer black Acura SUV.  A check of ESTREMERA's name through CT DMV files revealed that he has two vehicles registered to him: a red 1997 Toyota Corolla; and a black 2010 Acura MDX.  During an interview, DEA

investigators showed CS-1 a photo array that contained a photograph of ESTREMERA and other similar looking males. From this array, SARAGSOA identified ESTREMERA as the male known to him as "Matatan".

89.     CS-1 provided two telephone numbers used by ESTREMERA. CS-1 described both phones as being "burner phones". CS-1 said that ESTREMERA frequently switched telephone numbers in an attempt to thwart law enforcement. CS-1 said that on numerous occasions, CS-1 provided ESTREMERA with Fentanyl. On occasions when CS-1 provided ESTREMERA with smaller orders (such as 100 grams or 200 grams) of Fentanyl, CS-1 met ESTREMERA at 93 Chadwick Avenue and 25/27 Imlay Street in Hartford, CT. On multiple occasions, CS-1 provided ESTREMERA with a kilogram of Fentanyl. ESTREMERA paid $52,000 for a kilogram of Fentanyl. On these occasions when CS-1 provided ESTREMERA with a kilogram of Fentanyl, ESTREMERA directed CS-1 to deliver the kilogram to the apartment building located at 48 South Street, West Hartford, CT. CS-1 remembered going to an actual apartment in 48 South Street on one or two occasions and believed the apartment was on the second or third floor. CS-1 described the apartment as being a narcotics mill. Specifically, CS-1 said that he observed a table with loose narcotics, lights and mechanical presses. Additionally, CS-1 said that there was an older male who lived in the apartment who was tasked with overseeing the apartment. Investigators showed CS-1 a photo of Joseph COTTO from a publicly available social media account and CS-1 immediately identified COTTO as the older man who was guarding or overseeing the narcotics mill at 48 South Street, West Hartford, CT.

90.     Telephone records showed that a phone used by ESTREMERA frequently communicated with a phone used by COTTO. For example, on July 5, 2019, telephone number 860-682-8578 (which the U.S. Probation Office verified was the phone number for

42

ESTREMERA, who currently is on federal supervised release) communicated with 732-432-9652 (COTTO's phone) on sixteen occasions. Paid law enforcement databases revealed that 732-432-9652 is associated with Joseph Cotto of 48 South Street, Apt B3, West Hartford, CT. Sprint confirmed that 732-432-9652 is subscribed to Joseph COTTO. Further, a search of telephone number 732-432-9652 through Facebook Messenger associated this phone number with a publicly available Facebook profile for Joseph COTTO.

### C. Information from CS-2 regarding ESTREMERA.

91.     CS-2 provided information regarding ESTREMERA's narcotics trafficking activities. In substance, CS-2 advised that ESTREMERA is a large-scale Fentanyl trafficker in the Hartford, CT area. CS-2 advised that ESTRMERA obtained kilogram quantities of Fentanyl from AGUILAR and AGUILAR's DTO. CS-2 provided information regarding one instance when CS-2 provided ESTREMERA with two kilograms of Fentanyl in the City of Hartford. CS-2 provided information regarding another instance when CS-2 provided ESTREMERA with one kilogram of Fentanyl in the City of Hartford. CS-2 said that ESTREMERA currently owes a $100,000 drug debt to AGUILAR.

### D. Seizure of Over 1.5 Kilograms of Fentanyl from COTTO.

92.     I knew that there was an outstanding State of Connecticut probation violation warrant for COTTO. On March 13, 2020, I electronically verified that the probation warrant was still active. The other investigators and I had developed information that COTTO was living at a new apartment at 48 South Street, West Hartford, CT.

93.     On March 13, 2020, myself and other investigators went to 48 South Street in West Hartford, CT and spoke with the landlord for the multi-unit apartment building located at 48 South Street. The landlord advised that a man who fit the description of COTTO was living

in Apartment A3 at 48 South Street, West Hartford, CT. The landlord, who was in the presence

of me and other investigators, knocked on the door to Apartment A3 at 48 South Street, West

Hartford, CT. COTTO answered the door. I immediately recognized COTTO as the person who

answered the door.

94.     I advised COTTO that there was an active warrant for his arrest. I advised

COTTO of his *Miranda* rights. After advising COTTO of his rights, I told COTTO that the other

investigators and I had suspicion that there were narcotics in COTTO's apartment. COTTO

acknowledged that there were narcotics in his apartment and then showed me and the other

investigators some narcotics (specifically, suspected fentanyl) that COTTO had in his apartment.

95.     COTTO signed a written form acknowledging that he understood his *Miranda*

rights. In addition, COTTO signed a written form consenting to a search of his apartment. The

other investigators and I searched COTTO's apartment and found a total of approximately 1.5

kilograms of suspected fentanyl and approximately 500 wax folds of suspected fentanyl in the

apartment. Investigators field-tested a portion of the suspected fentanyl which produced a

positive reaction for the presumptive presence of fentanyl. COTTO was arrested for possession

with intent to distribute 400 grams or more of fentanyl, in violation of 21 U.S.C. §§ 841(a)(1)

and 841(b)(1)(A).

**E.     Post-Arrest Admissions of COTTO & Search of COTTO's Phone.**

96.     As discussed above, after advising COTTO of his Miranda rights, COTTO

admitted that he had narcotics in his apartment. COTTO stated that he was not the owner of the

narcotics that were seized from his apartment, but that they were owned by other individuals.

COTTO stated that his role was to guard the narcotics inside the apartment. COTTO stated that

he was paid $500 a week to do this. COTTO stated that his name was on the lease for the

apartment and for the utilities, but that the owners of the narcotics provided him cash to pay the

rent.  COTTO stated that sometimes he would weigh out portions of the narcotics to provide to

the owners, at their request.  COTTO stated that the owners of the narcotics also had keys to his

apartment and would come and go as needed.  COTTO stated that he has been in apartment A3

at 48 South Street since approximately November or December of 2019.  COTTO stated that he

previously lived in apartment B3 at 48 South Street, West Hartford, CT.  COTTO did not

provide the names of the owners of the narcotics.  COTTO was clearly reluctant to talk about the

owners of the narcotics because of fear for his safety.[5]

97.     COTTO provided DEA investigators with written consent to search his cellular

phone.  On March 13, 2020, I conducted a search of COTTO's cellular phone.  In the contact list,

I located, among other contacts, Daniel ESTREMERA's telephone number (i.e., 860-682-8578),

which was saved in COTTO's phone under the contact "Danny".  A preliminary search of

COTTO's cell phone uncovered a WhatsApp Chat with ESTREMERA on November 21, 2019,

in which ESTREMERA sent COTTO a message that read: "*What's good listen I got you your*

*OWN ["100" emoji] apartment way nicer than the one we had All have to do is grab some shield*

*for the windows have an AC already in there for the summer clean got the keys yesterday and*

*ALL GOOD!!!*"  COTTO responded: "*Kk good*" and "*Same spot*".

98.     I believe that the above WhatsApp message from ESTREMERA shows that

ESTREMERA acquired apartment A3 at 48 South Street for COTTO.  Additionally, this text

provides proof that ESTREMERA was involved in the acquiring of COTTO's previous

---

[5]  During the interview, COTTO referred to the owners of the narcotics as "Jose" and "Dude,"
but would not provide additional information regarding the owners.  When asked about "Danny,"
COTTO said that "Danny" was his nephew and that he was not involved with the narcotics in his
apartment.

apartment, likely apartment B3 at 48 South Street.  As discussed in detail above, on multiple

occasions CS-1 provided ESTREMERA with kilogram quantities of Fentanyl.  CS-1 said that on

each of these occasions, ESTREMERA directed CS-1 to deliver the Fentanyl to an apartment at

48 South Street, West Hartford, CT and that Joseph COTTO was responsible for overseeing or

guarding the narcotics at this apartment.  Further, during his post-arrest interview, COTTO

revealed that the owners of the narcotics were the same people who were providing COTTO with

money to pay his rent.

  **F.**  **Seizure of $14,960 from ESTREMERA on 8/14/19.**

  99.  On August 14, 2019, investigators (which included your Affiant) conducted

surveillance of ESTREMERA at 25/27 Imlay Street, Hartford, CT, which is a suspected

narcotics stash location used by ESTREMERA and FALCON.  Investigators observed

ESTREMERA and FALCON leave 25/27 Imlay Street together.  ESTREMERA was carrying a

satchel.  ESTREMERA and FALCON appeared to say goodbye as ESTREMERA walked

towards his Acura and drove away from Imlay Street.  After observing a motor vehicle violation,

investigators stopped ESTREMERA's Acura.  During a consent search of the Acura,

investigators found the satchel, which contained $14,960 in U.S. currency.  During questioning,

ESTREMERA provided inconsistent statements regarding the money and his whereabouts prior

to the traffic stop.  Investigators seized the $14,960.  After the traffic stop, E-911 precise location

information for ESTREMERA's phone showed that ESTREMERA traveled back to the area of

his residence at 14 Judson Ave, East Hartford, CT.

G.   **Surveillance of ESTREMERA and**
     **FALCON & Seizure of $72,570 on 8/28/19.**

100.   On August 28, 2019, investigators (which included your Affiant) conducted physical and electronic surveillance of ESTREMERA. Investigators observed ESTREMERA drive his Acura to Broad Street in Hartford and park along the curb in the area of 550 Broad Street. Investigators observed FALCON enter the front passenger's seat of the Acura. An investigator passed by the Acura and confirmed that vehicle was occupied by only ESTREMERA and FALCON.  Shortly thereafter, an investigator observed FALCON exit the Acura and cross the street. An investigator observed that FALCON was carrying a small rectangular object that was black in color and similar in size and packaging to a kilogram of narcotics. Your Affiant observed FALCON open the driver's side door of his Nissan Maxima. FALCON was bending down and leaning into the vehicle.  After several seconds, FALCON emerged and went to the passenger's side of the Nissan. Once on the passenger's side of the Nissan, I observed that FALCON had the passenger's door of the Nissan open. FALCON then walked away from the vehicle and went out of sight.

101.   An investigator observed the lights on ESTREMERA's Acura turn on. At approximately the same time, an investigator observed a blue Chrysler Minivan arrive to the area and partially enter the apron of a driveway across the street from the Acura. The Chrysler then backed out of the driveway onto Broad Street in the area of the Acura.  After the Chrysler backed into the street, the Acura departed and the Chrysler parked in the Acura's parking spot.  Based on their observations, investigators believed that ESTREMERA coordinated with the occupants of the Chrysler so that the Chrysler could occupy the same parking space.

102.    Shortly thereafter, I observed FALCON standing in the area of the Nissan with a small red backpack. Previously, FALCON was not carrying this backpack. An investigator then observed FALCON walk toward the area of the Chrysler. Investigators believe (but could not see to confirm) that FALCON entered the Chrysler. Seconds later, an investigator observed FALCON walking away from the Chrysler and entering the driver's side of the Nissan.

103.    Shortly thereafter, investigators observed Lorenzo ESTREMERA-MARTINEZ emerge from the area of the Chrysler, walk toward the passenger's side of FALCON's Nissan and hand the occupant of the Nissan a white plastic shopping bag. After passing the bag to the occupant of the Nissan, ESTREMERA-MARTINEZ walked back toward the area of the Chrysler. Approximately two minutes later, the Chrysler pulled away from the curb and began traveling north on Broad Street. The Chrysler was followed by surveillance units. Meanwhile, I followed FALCON as he traveled in his Nissan to 25/27 Imlay Street, which was a suspected narcotics stash location used by ESTREMERA and his associates.

104.    After the Chrysler departed the area, I coordinated with members of the Hartford Police Department to conduct a motor vehicle stop of the Chrysler. Based on our observations and our knowledge of this investigation, myself and other investigators believed that the occupants of the Chrysler had engaged in a narcotics transaction involving ESTREMERA and FALCON. After observing a motor vehicle violation, members of the Hartford Police Department conducted a motor vehicle stop with the Chrysler. The driver of the Chrysler was Vanessa FUNDORA-TOLEDO. Her husband, Lorenzo ESTREMERA-MARTINEZ, was seated in the rear passenger's side seat and their juvenile child was seated in the rear driver's side seat. During the stop, FUNDORA-TOLEDO appeared extremely nervous and her hands were

48

trembling.  FUNDORA-TOLEDO and ESTREMERA-MARTINEZ both provided false or inaccurate information regarding where they were coming from.

105.    Investigators had a certified narcotics-detection canine (K-9) conduct a sniff of the exterior the Chrysler.  The certified K-9 handler indicated that her K-9 made positive alerts to the presence of a narcotics odor in the area of the driver's side door.  Based on this positive K-9 alert, investigators searched the Chrysler and found $72,570 in U.S. currency in a plastic shopping bag behind the rear passenger's seat.  The K-9 conducted a sniff of the bag with the U.S. currency while it was in the Chrysler.  The K-9 handler indicated that her K-9 made positive alerts to the presence of a narcotics odor on the bag and its contents. Investigators noted that $72,570 was bound in several stacks and that it was behind the seat in which ESTREMERA-MARTINEZ was seated.

106.    During the stop, I questioned both ESTREMERA-MARTINEZ and FUNDORO-TOLEDO about the $72,570. Both ESTREMERA-MARTINEZ and FUNDORO-TOLEDO denied having any knowledge about the currency.  Neither could provide any justification for carrying $72,570 or say how the U.S. currency got in their car. ESTREMERA-MARTINEZ said that Officers could take the money and that he didn't even want a receipt.  ESTREMERA-MARTINEZ again provided inaccurate information regarding where they were traveling from. Based on the totality of the evidence, investigators believe that FALCON and ESTREMERA conducted a narcotics transaction in which ESTREMERA provided FALCON with a quantity of narcotics.  Investigators believe that $72,570 was payment for a quantity of narcotics that was exchanged.

## IX.   EVIDENCE REGARDING JONATHAN FALCON

### A.   Background & Overview regarding FALCON.

107.   FALCON is a Fentanyl distributor who resides in Hartford, CT.  FALCON is a convicted felon who has been arrested for, among other things, narcotics related crimes.

108.   FALCON is a close associate of Daniel ESTREMERA.  As discussed in detail above, on two occasions in August 2019, investigators seized large sums of suspected narcotics proceeds from ESTREMERA and associates of ESTREMERA.  Just prior to both seizures, investigators observed ESTREMERA in the company of FALCON.  Specifically, on August 14, 2019, investigators seized $14,960 from ESTREMERA after observing ESTREMERA and FALCON leave their suspected narcotics stash location at 25/27 Imlay Street in Hartford, CT. On August 28, 2019, investigators seized $72,570 from two of ESTREMERA's and FALCON's associates (ESTREMERA-MARTINEZ and FUNDORO-TOLEDO) after observing what appeared to be a narcotics-related transaction involving ESTRMERA, FALCON and these associates.

109.   During this investigation, investigators used a confidential source (CS-5) to conduct two controlled purchases of Fentanyl from FALCON.  In addition, investigators arrested two narcotics customers of FALCON after investigators observed the customers purchase crack and heroin from FALCON.  One of these customers provided a written statement admitting that FALCON had sold the crack and heroin to them.

### B.   Information from CS-5 regarding FALCON.

110.   During the month of September 2019, a confidential source ("CS-5") provided investigators with information regarding Johnathan FALCON, who as detailed herein is a criminal associate of Daniel ESTREMERA.

50

111.   CS-5 said, in substance, that CS-5 knows FALCON by the alias "Orlando." CS-5 has known FALCON for more than several months and has conducted drug transactions with FALCON in the past.  CS-5 has observed FALCON operating a white Infinity in the past. Through Hartford Police Department records, investigators identified a white Infinity Coupe bearing CT registration AK-74420 associated with FALCON. CS-5 said that in the past, FALCON frequently directed CS-5 to the area of Broad Street between Capital Avenue and Russ Street in Hartford, CT as a location to conduct drug transactions.  FALCON has told CS-5 that his mother lived on Broad Street.  CS-5 believed that FALCON's mother has since moved to an apartment on Russ Street on the corner of Broad Street in Hartford.  CS-5 said that he/she could conduct controlled purchases of narcotics from FALCON.

C.   **Controlled Purchase of Fentanyl from FALCON on 9/12/19.**

112.   On September 12, 2019, investigators used CS-5 to conduct a controlled purchase of two (2) bundles of Fentanyl from Jonathan FALCON.  On that day, CS-5, while in the presence of me and another investigator, called FALCON to arrange a narcotics transaction. FALCON agreed to meet CS-5 in Hartford.  Investigators searched CS-5 and his/her vehicle for contraband with negative results.  Investigators provided CS-5 with official evidence funds to conduct the transaction.  In addition, investigators conducted physical surveillance of CS-5 during the transaction and as CS-5 traveled to/from the transaction.

113.   CS-5 subsequently spoke to FALCON and FALCON directed CS-5 to 50 Sumner Street, Hartford, CT.  Shortly thereafter, CS-5 arrived to Sumner Street and parked curbside as observed by investigators.  Moments later, investigators observed FALCON's black Nissan Maxima turn onto Sumner Street.  Shortly thereafter, an investigator observed a white male approach the Maxima and appear to enter on the passenger side of the Maxima.  The investigator

51

then observed the Maxima continue down Sumner Street and pull up next to CS-5's vehicle. I

observed the Maxima come to a stop next to CS-5's vehicle briefly and then pull away

continuing south on Sumner Street and pull into a parking lot just prior to Asylum. I also

observed CS-5 pull away and drive away from the area.  Investigators followed CS-5 as he/she

traveled back to a prearranged location.

114.    At the secure location, CS-5 provided investigators with twenty green wax bags

containing a white powdered substance of suspected Fentanyl.  The twenty bags had a gross

weight of 35.5 grams. The bags were bound with red rubber bands into two bundles of ten bags

each.  CS-5 reported that when the Maxima pulled up next to CS-5's vehicle, CS-5 recognized

the driver of the Maxima to be FALCON.  CS-5 said that FALCON passed two (2) bundles of

Fentanyl to his female passenger (whom CS-5 suspects to be FALCON's girlfriend), who in turn

passed the two bundles of Fentanyl to CS-5.  While at the secure location, investigators searched

CS-5 and his/her vehicle for excess monies or contraband with negative results.  The DEA

Laboratory subsequently confirmed that the twenty green wax bags that FALCON sold to CS-5

on September 12, 2019 did in fact contain Fentanyl.

**D.**    **Controlled Purchase of Fentanyl from FALCON on 10/2/19.**

115.    On October 2, 2019, investigators used CS-5 to conduct a second controlled

purchase of two bundles (20 wax folds) of heroin/Fentanyl from Jonathan FALCON.  On

October 2, 2019, investigators met with CS-5 at a prearranged location, where CS-5 and his/her

vehicle were search for contraband with negative results. Investigators provided CS-5 with

official advanced funds. While in the presence of investigators, CS-5 contacted FALCON by

phone to arrange a narcotics transaction.  CS-5 inquired if he/she could meet with FALCON now

to conduct a narcotics transaction and FALCON said he would text CS-5 an address to meet.

52

116.    Shortly thereafter, CS-5 placed a phone call to FALCON and requested the

meeting location address.  FALCON directed CS-5 to 50 Sumner Street, Hartford, CT.

Investigators followed CS-5 as he/she traveled to the area of 50 Sumner Street.  In addition,

investigators had set up surveillance in this area in anticipation of the controlled purchase.

117.    Moments later, investigators observed a white Infinity sedan turn onto Sumner

Street. Investigators were previously aware that this white Infinity is used by FALCON. I then

observed the Infinity travel slightly past CS-5's vehicle and turn into a parking lot just north of

CS-5's vehicle on the west side of Sumner Street and park out of view.

118.    Moments later, CS-5's vehicle pulled away from the curb and began to travel

south on Sumner Street. The view of the passenger's side of CS-5's vehicle was obstructed by

parked vehicles lining the west curb line of Sumner Street.  However, I spoke telephonically to

CS-5 who reported what happened.  CS-5 said that FALCON exited the white Infinity, walked to

CS-5's vehicle and entered the front passenger side of CS-5's vehicle. CS-5 said that when

FALCON entered CS-5's vehicle, CS-5 provided FALCON with $60 in exchange for two

bundles of narcotics.  CS-5 said that FALCON retrieved the two bundles of narcotics from his

front pants pocket.

119.    After the deal, investigators followed CS-5 as he/she traveled to a prearranged

location, where CS-5 relinquished custody of twenty green wax paper bags each containing a

powder like substance of suspected Fentanyl. The DEA Laboratory subsequently confirmed that

the twenty green wax bags did in fact contain Fentanyl.

E.    **Seizure of Crack and Heroin that FALCON Sold to Two Customers.**

120.    Following FALCON's controlled sale of two bundles of Fentanyl to CS-5 on

October 2, 2019, investigators maintained surveillance on FALCON. At approximately 4:14

p.m., an investigator observed FALCON in his white Infinity while parked curbside in front of

25/27 Imlay Street, Hartford, CT. At approximately 4:18 p.m., myself and SA Hanson observed

a white pickup truck (which was later identified as a white GMC Sierra) park curbside in front of

25/27 Imlay Street in close proximity to FALCON's white Infinity. Myself and SA Hanson then

observed FALCON approach the driver's side of the GMC Sierra and reach into the open driver's

side window in what appeared to be consistent with a hand-to-hand drug transaction. Seconds

later, FALCON returned to the white Infinity and the GMC Sierra drove away from Imlay Street.

121.    Investigators had coordinated with a Hartford Police marked unit to conduct a

patrol stop of the GMC Sierra, if appropriate.  After observing a motor vehicle violation,

Hartford Police Officers conducted a stop of the white GMC Sierra.  Upon stopping GMC Sierra,

Officers observed narcotics in plain view within the vehicle, which ultimately led to the arrest of

both occupants.  The driver of the GMC Sierra was Ryan TALAGA and the passenger was

Edward BELL.  After advising TALAGA and BELL of their *Miranda* rights, TALAGA admitted

that they had obtained the narcotics (i.e., crack and heroin) from FALCON, who TALAGA knew

as "Orlando."  TALAGA subsequently provided a written statement and consented to

investigators taking a photograph of TALAGA's phone, which showed the phone number for

"Orlando" as 413-378-4893.  Significantly, "Orlando" is a known alias for FALCON and 413-

378-4893 is known to investigators as a phone used by FALCON to facilitate narcotics sales. In

substance, TALAGA admitted that he and BELL met with FALCON on Imlay Street in Hartford

(which they had done on other occasions in the past), where FALCON sold TALAGA and BELL

the crack cocaine and heroin that were seized by law enforcement

122.    From the GMC Sierra, investigators seized one clear knotted plastic bag

containing a white rock substance of suspected crack (which had a gross weight of

approximately 37.9 grams) and ten (10) green wax paper sleeves each containing a powder like

substance of suspected heroin (which had a gross weight of approximately 37.7 grams).

Investigators sent this evidence to the DEA Laboratory for further analysis.

## X.     EVIDENCE REGARDING COLON

123.   This investigation revealed that Reinaldo COLON, Jr. (COLON) obtained

narcotics from AGUILAR and his associates.

### A.     Information from TORRUELLA's Phone.

124.   As discussed above, when investigators searched TORRUELLA's phone, they

found text communications between TORRUELLA and AGUILAR, during which they

discussed narcotics trafficking activities.  In part, during a text message conversation between

TORRUELLA and AGUILAR which occurred on January 24, 2020, AGUILAR told

TORRUELLA that he wanted TORRUELLA to provide a sample of narcotics to a friend of

AGUILAR's (i.e., "And I want to give a photo to a friend of mine, he asked me for one a little

while ago because he gets me a lot of pills but he pays cash.").

125.   The conversation continued and AGUILAR told TORRUELLA that this person

(who investigators believe is COLON) was disabled and that he would be coming to Connecticut

from Massachusetts ("And the photo one is from Mass but he'll come down and look for it in our

area. He's disabled, he doesn't walk, so tell me where and I'll tell him where to go but he can't

exit his car").  The conversation continued and AGUILAR told TORRUELLA to provide this

person with one gram ("The photo guy says to just give him one point of the photo"). I know

from my training, experience, and participation in this and other narcotics investigations that the

term "point" is commonly used to describe gram increments of uncut quantities of narcotics.

The conversation continued and, at approximately 6:25PM, AGUILAR told TORRUELLA that AGUILAR was going to provide his friend with TORRUELLA's number.

126.    A continued search of TORRUELLA's phone revealed that on January 24, 2020, at approximately 6:39PM, TORRUELLA received a text from telephone number 603-369-2146 that read "This is Bayo's friend, what is the address." Investigators believe that telephone number 603-369-2146 is used by COLON, who is disabled and resides in Massachusetts. Investigators believe that COLON is reaching out to TORRUELLA per the preceding discussion between TORRUELLA and AGUILAR.

127.    Significantly, TORRUELLA was arrested on January 24, 2020 before he could meet with GONZALEZ and then with COLON.  In addition to seizing the kilogram of Fentanyl (which TORRUELLA was bringing to GONZALEZ), investigators also found a sample of Fentanyl in TORRUELLA's possession.  Investigators believe that TORRUELLA was going to give this sample to COLON, per AGUILAR's instructions in the text communications.

**B.    Meeting between COLON and GUZMAN on 2/3/20.**

128.    On February 3, 2020, investigators conducted surveillance on GUZMAN. Investigators also were using E-911 precise location data for GUZMAN's phone. On that day, investigators observed GUZMAN operating a black Chevy pickup rental vehicle.

129.    At approximately 6:08 pm, an investigator observed the Chevy pickup enter the parking lot behind the apartment building located at 470 Capital Ave Hartford, CT.  This is a large apartment complex located at the corner of Capital Avenue and Broad Street that provides housing for senior citizens. At approximately 6:10 pm, an investigator observed the Chevy, operated by GUZMAN, turning northbound onto Broad Street from the parking lot behind 470 Capital Ave.  At approximately 6:13 pm, an investigator observed a dark Ford Edge with

Massachusetts a license plate in the parking lot attached to 470 Capital Ave. The Ford was occupied by two males and was parked and running. At approximately 6:14 pm, the Ford exited this lot and travel north onto Broad St.

130.    At approximately 6:15 pm, an investigator observed the Ford enter the parking lot of the Shell gas station on the corner of Capital Ave and Broad St and park on the south side of the lot near the gas station store. An Investigator observed a Hispanic male later identified as Reinaldo COLON SR. exit the Ford and enter the gas station. At approximately 6:18 pm, COLON SR exit the store and spoke to the driver of the vehicle, later identified as Reinaldo COLON JR.

131.    At approximately 6:23 pm, investigators approached COLON SR and COLON JR to conduct a field interview. During the course of this interview, COLON SR and COLON JR were identified as father and son. COLON JR said that he traveled from Massachusetts to Hartford to visit his father. COLON JR informed officers that he was disabled that he could not walk. COLON SR said that he lives at 470 Capital Ave. Surveillance was terminated after this field interview was finished.

132.    A review of telephone toll records showed that on February 3, 2020 at approximately 6:05PM, GUZMAN's phone (**Target Telephone 3**) received an incoming call from 603-369-2146 (believed to be COLON's phone). Shortly thereafter, at approximately 6:08PM, **Target Telephone 3** made an outgoing call to 603-369-2146. Toll records revealed that GUZMAN had telephonic contact with 603-369-2146 at approximately the same time that GUZMAN was observed entering the rear lot of 470 Capital Avenue. Based on this information, the traffic stop with COLON and information obtained from the consensual search of

TORRUELLA's phone, I believe that Reinaldo COLON Jr is the user of telephone number 603-369-2146.

### C.   Calls between COLON and GUZMAN on 2/16/20.

133.   On February 12, 2020, GUZMAN over **Target Telephone 3** made an outgoing call to COLON, using 603-369-2146.  During this call, in sum, COLON and GUZMAN made plans to meet on the weekend (February 15-16, 2020).  COLON said "I'm thinking of coming down there this weekend" which I believe is a reference to coming to Connecticut from Massachusetts.

134.   On February 16, 2020, **Target Telephone 3**, used by GUZMAN, made an outgoing call to COLON, using 603-369-2146.  In sum, COLON asked if they could meet on February 16, 2020 and went on to say "Tomorrow, I'm going to see my grandmother that fell and all that, so it's in the same building".  Here, I believe that COLON is referring to the building located at the corner of Broad Street and Capital Avenue in Hartford, CT.  GUZMAN and COLON then agreed to meet and talk on February 16, 2020.

135.   On February 16, 2020, at approximately 4:39PM, **Target Telephone 3**, used by GUZMAN, received an incoming call from COLON using 603-369-2146.  In sum, COLON told GUZMAN to meet at the same place (i.e., "…at the same place").  GUZMAN in turn replied that he was 25-30 minutes away and asked if COLON would be there.  COLON then replied "Yes, if not, I will leave with my old man and he'll bring it down to you since he lives right there."  Again, based on the content of this conversation, I believe that COLON is telling GUZMAN to meet at 470 Capital Avenue, which is COLON SR's address.  Additionally, while not specified, I suspect that COLON JR was likely going to provide GUZMAN with payment for narcotics.

58

136.   On February 16, 2020, at approximately 5:08PM, **Target Telephone 3**, used by

GUZMAN, received an incoming call from COLON using 603-369-2146.  During this

conversation, GUZMAN informed COLON that he was on his way and COLON said that he left

it with his father (i.e., COLON SR). GUZMAN then replies then when he arrives he will call

COLON, who can then call COLON SR.  GUZMAN then asks if he should go in back and

COLON replies yes.

137.   On February 16, 2020, at approximately 5:39PM, **Target Telephone 3**, used by

GUZMAN, made an outgoing call to COLON, using 603-369-2146.  During this call GUZMAN

was clarifying the address.  COLON then responds "Damn! I think it is 55 Capitol, between the

corner of Capitol and Broad"  GUZMAN acknowledges and COLON says "I think that what is

was...  Or was it three (3)55? I don't remember….".  GUZMAN again acknowledges and

COLON says "yeah, its Broad and Capital."

138.   On February 16, 2020, at approximately 6:12PM, **Target Telephone 3**, used by

GUZMAN, made an outgoing call to COLON, using 603-369-2146.  During this call, GUZMAN

advised COLON that he had arrived.  Worth noting, at approximately 6:15PM, precision location

data for a phone used by GUZMAN showed that the device was in the area of Broad Street and

Capital Avenue.  Additionally, at approximately 6:16PM, precision location data for **Target

Telephone 3**, also showed the device to be in the same area.

139.   On February 16, 2020, at approximately 8:16PM, **Target Telephone 3**, used by

GUZMAN, made an outgoing call to COLON, using 603-369-2146. During this call, GUZMAN

speaks to COLON and tells COLON that he hasn't met with COLON SR yet.  GUZMAN then

asks if COLON SR is in a vehicle and COLON replies "No, he should be on foot. Hold on, hold

on. He should be coming out of the building." The conversation continues and COLON tells GUZMAN that he (COLON) is receiving a call from COLON SR.

140.    On February 16, 2020, at approximately 8:18PM, **Target Telephone 3**, used by GUZMAN, made an outgoing call to COLON, using 603-369-2146. During this call GUZMAN advised COLON that he met COLON SR (i.e., "I already saw him already").

141.    Again based on the content of the conversation between GUZMAN and COLON, and the consensual search of TORRUELLA's phone, I believe that COLON is a narcotics customer of AGUILAR and that GUZMAN likely collected narcotics proceeds from COLON on February 16, 2020.

## XI.    EVIDENCE REGARDING TOMAS ALERS

142.    The investigation has revealed that Tomas ("Tommy") ALERS is an alternate source of supply of narcotics for GONZALEZ.

### A.    Intercepted Calls between GONZALEZ and ALERS on 2/25/20.

143.    On February 25, 2020, at approximately 4:17PM, **Target Telephone 1**, used by GONZALEZ, received an incoming call from Tomas ALERS, using 860-655-6543. A commercial database check connects 860-655-6543 to Tomas Alers of 52 Magnolia St, Hartford, CT. In addition, Sprint identifies the subscriber for 860-655-6543 as Tomas Alers of 52 Magnolia St, Hartford, CT. During this call, GONZALEZ and ALERS discuss the following:

GONZALEZ:  What's up Tommy?

ALERS:      What up, man? Yo! Um, the type of um... trims that you guys need for the apartment um...How many uh... How many feet y'all need?

GONZALEZ:  Oh I don't... [Voices Overlap]

ALERS:      This dude said uh... He said 100 feet or 200.

GONZALEZ: Yeah... [Voices Overlap]

ALERS:      And these are the two (2), two (2) inch that you guys want and shit.

GONZALEZ: Depends... [Stammers] on the insulation. Depends how thick it is.

ALERS:      Oh.

GONZALEZ: You don't... [Stammers] know how thick they... You don't know if it's a point five (.5) insulation or a one (1) inch insulation?

ALERS:      No, right now is a two (2) inch insulation.

GONZALEZ: Shit, man! Um... [Stammers] Damn and I just put a order too. Let me um... Let me cancel, let me cancel the order from the first uh..., from the other shop. I'll call you right back.

ALERS:      Alright.

GONZALEZ: I'ma call you right back, just pick up.

ALERS:      Alright.

GONZALEZ: Alright.

144.    During this conversation, GONZALEZ greets ALERS as "Tommy."

GONZALEZ and ALERS then have a coded conversation about quantities of Fentanyl.

Specifically, when ALERS asks if GONZALEZ wants one hundred or two hundred feet of

"trim," I believe that ALERS is asking GONZALEZ if he wants 100 or 200 grams of Fentanyl.

GONZALEZ then responds it will depend in the thickness and if it is ".5 or one inch insulation."

Here, I believe GONZALEZ is asking ALERS about the quality of the Fentanyl and how much

"cut" can be added.  I know from my training, experience and participation in this in other

narcotics investigations that narcotics distributors often determine the quality of Fentanyl after

determining how much "cut" can be added to the Fentanyl.  For example, the reference to ".5" is

likely a reference to being able to add 100 grams of cut to 200 grams of Fentanyl. Similarly, a

reference to "1" is a reference to being able to add 200 grams of cut to 200 grams of Fentanyl.

ALERS then responds that that "…right now is a two (2) inch insulation," which likely is a

coded reference to being able to add four hundred grams of cut to two hundred grams of

Fentanyl.  GONZALEZ acknowledged and says that he will call ALERS back.

145.   On February 25, 2020, at approximately 4:19PM, GONZALEZ, using **Target**

**Telephone 1**, made an outgoing call to ALERS, using 860-655-6543.  This conversation is as

follows:

ALERS:      Yo.

GONZALEZ: Yo, um... [Stammers] Uh... Where are you?

ALERS:      I'm here. Um... I'm at my crib cleaning up the yard and shit. That's why I
            wanted to know, because I... [Stammers] can't bring you a little piece of
            insulation to show you. I might as well bring you the whole thing and you
            check if the insulation works out for you.

GONZALEZ: All right. Fucking um... Uh... All right so listen um... I'm at the shop right
            now in Bristol. I'm waiting for my girl to do what she gotta do, to come
            get me. And then I gotta go to fucking Hartford. So you want me to call
            you when I get to uh... to the spot over there?

ALERS:       Yeah, yeah, yeah. But how many...  How many um... [Stammers] square
            feet you need of insulation?

GONZALEZ: Just...  [Sighs] I wanna play it safe just, just give me 100 yards.

ALERS:      100 yards?

GONZALEZ: Yeah.

ALERS:      Oh, okay.

GONZALEZ: Cause how... [Stammers] sure are you? You know?

ALERS:      Um... I just seen it. It's... [Stammers] shit good. And the insulation that
            you need and everything.

GONZALEZ: Just, just bring um... the 20 square feet.

ALERS:      Huh?

GONZALEZ: Just bring 200... 200 feet. And then... then I'll check there.

ALERS:      All right.

GONZALEZ: All right.

146.   In the above conversation, ALERS informs GONZALEZ that he will not be able to bring GONZALEZ a "sample" ("a little piece of insulation") and that ALERS will have to bring the whole thing.  GONZALEZ and ALERS then agree that GONZLEZ will take 200 grams (i.e., 200 feet) and that GONZALEZ can "check" the product when he gets it, which is a reference to testing the quality.

147.   On February 25, 2020, at approximately 4:21PM, GONZALEZ, using **Target Telephone 1**, made an outgoing call to ALERS.  During this conversation, GONZALEZ reiterated that he wanted 200 grams (i.e., 200 square feet).

148.   Following their conversation, GONZALEZ and ALERS engaged in series of text messages in which GONZALEZ informed ALERS that he would contact ALERS when he arrived in Hartford.  Investigators believed GONZALEZ would be traveling to his suspected stash location at 22 Atwood Street, Hartford, CT and that ALERS would deliver the two hundred grams of Fentanyl to GONZALEZ.

**B.     Arrest of Tomas ALERS on 2/25/20.**

149.   On February 25, 2020, investigators established surveillance on ALERS at his residence at 52 Magnolia Street in Hartford.  Investigators observed a red Ford pickup truck, which investigators had observed ALERS driving previously on February 25, 2020, parked at the residence.  Investigators also requested the assistance of a Hartford Police marked unit to conduct a stop of ALERS when he left the residence.

150.     At approximately 8:28PM, GONZALEZ sent ALERS and text message indicating that he arrived.  ALERS in turn responded that he would be on his way.  Approximately ten minutes later, investigators observed ALERS's red Ford pickup truck departing 52 Magnolia Street.  Surveillance units followed the Ford pickup, which was driven by ALERS.  Moments later, members of the Hartford Police Department conducted a motor vehicle stop of the Ford pickup.  The motor vehicle stop was conducted a short distance away from 22 Atwood Street.

151.     When officers approached the Ford pickup, they identified ALERS as the operator and sole occupant of the vehicle.   During the stop, investigators located a clear plastic bag containing a substance that field tested positive for the presence of heroin or Fentanyl and a 9mm Beretta firearm.  HPD Officers arrested ALERS on state criminal charges.

152.     After the arrest of ALERS, investigators intercepted a call over **Target Telephone 1** between GONZALEZ and Coraima SALGADO, during which GONZALEZ said that he (GONZALEZ) learned from a third party that Tommy's (ALER's) truck got pulled over by the police.  GONZALEZ told SALGADO, "So fucking...I just grabbed all the big stuff and put it in my pocket. And I left there. I'm walking. I'm at Gillette [Street] right now. I just told City [David CINTRON] to fucking pick me up."  E-911 location data for **Target Telephone 1** showed that at the time of the stop of ALERS, GONZALEZ was in the area of 22 Atwood Street, Hartford, CT, which is a "stash" location used by GONZALEZ and CINTRON to process narcotics for resale.  During the above call, I believe that GONZALEZ was telling SALGADO that he grabbed all of the large amounts of narcotics and left their stash location at 22 Atwood Street.

153.     Thereafter, investigators intercepted multiple calls between GONZALEZ over **Target Telephone 1** and female who was using a telephone subscribed to Tomas ALERS at 52

Magnolia Street and who is believed to be ALERS's girlfriend/wife.  During these calls, they

discussed the arrest of ALERS.  The female said that ALERS wanted her to call GONZALEZ to

tell GONZALEZ "to get out from the house," likely in reference to GONZALEZ getting out of

22 Atwood Street.  GONZALEZ told the female to be careful what she says when talking to

ALERS over the phone.

## XII.   EVIDENCE REGARDING HOULE, DELLABIANCA AND DESROCHES.

154.   As discussed above, investigators intercepted communications over **Target**

**Telephone 2** between approximately January 15, 2020 and February 5, 2020.  Intercepted

communications over **Target Telephone 2** revealed that CINTRON distributed resale quantities

of narcotics (Fentanyl) to numerous narcotics customers, including Jessica HOULE, Adam

DELLABIANCA and Andrew DESROCHES.

### A.   Overview of Interceptions between CINTRON and HOULE.

155.   During the approximately 22 days that investigators intercepted communications

over **Target Telephone 2**, investigators intercepted numerous drug-related communications

between HOULE and CINTRON, during which HOULE arranged to obtain "stacks" of Fentanyl

from CINTRON.  A "stack" is a common reference to 100 wax folds or bags of Fentanyl or

heroin.  During this three-week period, HOULE arranged to get multiple "stacks" of Fentanyl

from CINTRON approximately every three days.  Based on these intercepted communications

over **Target Telephone 2**, HOULE typically arranged to get between 6 and 7 stacks of Fentanyl

at a time.

**B.    Arrest of Jessica HOULE after she purchased
Seven Stacks of Fentanyl from CINTRON on 2/4/20.**

156.    On February 4, 2020 between approximately 5:20 p.m. and 5:45 p.m., agents

intercepted the following text communication between **Target Telephone 2** (CINTRON) and a

female subsequently identified as Jessica HOULE, who was using phone number (959) 242-

4011:

| | |
|---|---|
| CINTRON: | lmk if u coming today |
| HOULE: | Yes |
| HOULE: | Need big order |
| CINTRON: | wat |
| HOULE: | What will make it cheaper |
| HOULE: | How much I gotta buy |
| CINTRON: | call me |
| HOULE: | let me get home |
| HOULE: | 5 min |
| CINTRON: | Ok |

157.    Based on the above text communications, investigators believed that HOULE was

arranging to buy a significant order of narcotics from CINTRON. At approximately 5:56 p.m.,

agents intercepted an incoming call from HOULE to **Target Telephone 2**. During the

conversation, HOULE asked CINTRON "so where are we?" CINTRON replied "the most is

boxes, I do them for 800." The conversation continued briefly with poor audio quality. Based

on my training, experience and knowledge of this and other narcotics investigations, I know that

a "box" is a common reference to 500 wax folds or bags of Fentanyl/heroin.

158.   Between approximately 6:10 p.m. and 7:39 p.m., CINTRON over **Target Telephone 2** had the following text communications with HOULE to arrange their narcotics transaction:

> HOULE:     we were talking and we've been very dead so I'm just going to get 7 for now and if we pick up I'll grab more I don't want to sit on shit to long
>
> CINTRON:   u rite but lmk
>
> HOULE:     I up here now where am I going

159.   Based on these text communications, investigators believed that HOULE was arranging to buy seven stacks (700 bags) of Fentanyl from CINTRON. At approximately 7:43 p.m., agents intercepted an incoming call from HOULE to **Target Telephone 2**. During the conversation, HOULE asked "where am I going?" HOULE indicated she was by Atwood Street. CINTRON indicated he was elsewhere. HOULE said "alright, I got a GPS". CINTRON said that he was going to "send a picture right now". At approximately 7:45 p.m., agents intercepted an outgoing text from **Target Telephone 2** to HOULE that said: "1261 burnside ave east hartford".

160.   At approximately 8:00 p.m., agents and TFOs established surveillance in the area of 1261 Burnside Avenue, East Hartford, CT, which is a McDonalds restaurant. At approximately 8:02 p.m., investigators observed CINTRON arrive in his white BMW X6 and park in the McDonalds lot. Between 8:06 p.m. and 8:10 p.m., investigators intercepted the following text messages: CINTRON: "how long" HOULE: "3 min" CINTRON: ok" HOULE: "Remember I need seven total" CINTRON: "ok". During this exchange, investigators believe that HOULE was confirming that she needs seven stacks of Fentanyl ("Remember I need seven total").

161.    At approximately 8:15 p.m., investigators observed a red Nissan Sentra pull into the McDonald's parking lot and park directly alongside CINTRON's BMW.  An Investigator observed the white female operator (later identified as HOULE) of the red Nissan Sentra exit the vehicle and get into the rear seat drivers side of CINTRON's BMW. Seconds later, an investigators observed HOULE exit from CINTRON's BMW and return to her Nissan Sentra. CINTRON's BMW drove away from McDonalds.  HOULE's Nissan Sentra went through the drive-thru at McDonalds and then departed the area.  Surveillance units followed the Nissan Sentra.

162.    At approximately 8:28 p.m., after observing motor vehicle violations, a Manchester Police Department (MPD) Officer initiated a motor vehicle stop of the Nissan Sentra. Jessica HOULE, who was the operator and the sole occupant of the Nissan Sentra, was identified via her CT Driver's License. During the stop, investigators located a significant quantity of Fentanyl on HOULE's person. While speaking with HOULE, she informed the officers that she had approximately "7 stacks" (700 bags) of Fentanyl.  As discussed above, the seven stack of Fentanyl that were seized from HOULE correlated with the texts in which HOULE told CINTRON that she "needed seven total".  In addition, officers located a small amount of crack cocaine in HOULEs possession.  HOULE was arrested on state charges and transported to the Manchester Police Department for processing.

C.    **HOULE's Post-Arrest Admissions regarding CINTRON.**

163.    At approximately 10:30 p.m., other investigators and I spoke with HOULE regarding the events leading up to her arrest.  An MPD officer advised that HOULE had been read her *Miranda* rights and HOULE had signed a Rights Form indicating such.  An MPD

detective advised that he asked HOULE if she was interested in speaking to investigators which she voluntarily agreed to.

164.    During the interview, HOULE said, in substance, the following: HOULE said that she had purchased the Fentanyl seized by law enforcement from David CINTRON. HOULE said she has known and purchased drugs regularly from CINTRON for approximately five (5) years. HOULE said that she calls CINTRON by the alias "Kobe." HOULE said that she pays approximately $180 per stack ($180 per 100 bags), however, the price becomes cheaper the more she purchases. HOULE said that earlier that night she met CINTRON at a McDonalds parking lot in East Hartford and purchased 700 bags of Fentanyl from CINTRON for $700. HOULE said that she owes CINTRON approximately $900. HOULE said that CINTRON has a black female girlfriend, name unknown. HOULE said that CINTRONs girlfriend has been present on occasions in the past during drug transactions between HOULE and CINTRON.

165.    HOULE said that CINTRON has been driving a white BMW SUV style vehicle lately and that he was driving that vehicle tonight when she met CINRON at the McDonalds. HOULE said that CINTRON has a partner in his drug dealing operation, who HOULE described as a short bald guy with a lot of tattoos. HOULE said that she has met CINTRON at multiple locations in the past to conduct drug transactions to include: Gillette Street in Hartford; Popeye's restaurant; a house in New Britain, CT (near a Dollar General); and at an apartment building on Atwood Street in Hartford (near Saint Francis Hospital, she thinks #25 Atwood but was not sure). With regard to the Atwood Street location, HOULE said she met CINTRON in the back parking lot on occasion or in the stairwell inside the apartment building.

166.    HOULE said that she would re-up from CINTRON approximately every 3-4 days, each time purchasing approximately 600-700 bags of Fentanyl. HOULE said she has been

purchasing that quantity for the last several months, but estimated less than a year (HOULE was

purchasing smaller amounts prior to that spanning back approximately 5 years). HOULE said she

has never seen CINTRON with guns, however, HOULE believes that CINTRON has access to

them, as HOULE has known friends that have traded guns for drugs when dealing with

CINTRON. HOULE said that the address she met CINTRON at earlier that night was 1261

Burnside Avenue, East Hartford (retrieved from her text messages). HOULE said that she

contacts CINTRON at phone number (860) 371-7614 (i.e., **Target Telephone 2**). HOULE said

that CINTRON changes phones approximately every three months.  HOULE said that she has a

drug habit and has so for years. HOULE said that she uses some of the product she purchases

from CINTRON and she also sells Fentanyl to others in the Norwich, CT area, where she is able

to get $9-10 per bag.

### D.   Interceptions between HOULE and CINTRON on 2/5/20.

167.    On February 5, 2020, the day after HOULE's arrest, investigators intercepted

multiple communications between HOULE (over her husband's phone) and CINTRON (over

**Target Telephone 2**) during which HOULE told CINTRON about her arrest the prior day.

During a call at 11:36 a.m., they discussed, in part, the following: HOULE: "Don't call, don't call

that phone no more. I got busted leaving you last night."  CINTRON: "What happened?"

HOULE: "I got busted leaving last night."  CINTRON: "Was from me, what you got?"

HOULE: "I got busted with all that shit on me."  CINTRON: "Last night?"  HOULE: "Yeah,

after I left you."  During this same call, HOULE explained that the police had seized everything

from her.  HOULE further said that she did not have any product and indicated that she needed

more product because her customers were getting sick.

168.    After this initial call, HOULE and CINTRON had multiple follow-up communications on February 5, 2020, during which they discussed HOULE's arrest and getting a new phone. In addition, during intercepted calls between HOULE and CINTRON on February 5, 2020 at approximately 1:27pm and 1:33pm, HOULE made arrangements to meet with CINTRON on Atwood Street in Hartford (i.e., to obtain narcotics). Shortly thereafter on February 5, 2020, CINTRON "dropped" or stopped using **Target Telephone 2**. Investigators believe that CINTRON stopped using **Target Telephone 2** and obtained a new phone to discuss and arrange narcotics transactions because of the arrest of HOULE.

### E.    Interceptions between DELLABIANCA and CINTRON.

169.    Between January 14, 2020 and February 5, 2020, investigators intercepted numerous communications between CINTRON (over **Target Telephone 2**) and Adam DELLABIANCA (using 860-371-7349), during which they discussed and arranged for DELLABIANCA to obtain resale quantities of narcotics (Fentanyl) from CINTRON.

170.    For example, on February 4, 2020, at approximately 1:40 p.m., agents intercepted an incoming call to **Target Telephone 2** from Adam DELLABIANCA, using phone number (860) 371-7349. During the call, DELLABIANCA told CINTRON "one of his boys got his taxes back, so I think he wants a box, he's supposed to call me back I'll let you know." CINTRON affirmed and said to "just let me know". At approximately 4:10 p.m., agents intercepted an outgoing call from CINTRON over **Target Telephone 2** to DELLABIANCA. During the call, DELLABIANCA told CINTRON "I'm bout to go pick up the money from him". DELLABIANCA said he was going to be in Bristol. CINTRON replied to "call me when you're on your way over". DELLABIANCA asked CINTRON "you want me to come out there?" CINTRON replied "Yea, Atwood".

171.    At approximately 4:20 p.m., surveillance was established in the area of 22 Atwood Street, Hartford, CT.  As discussed in this affidavit, this investigation has revealed that CINTRON and GONZALEZ stashed narcotics at 22 Atwood Street and distributed narcotics in the area of 22 Atwood Street.  At approximately 4:31 p.m., agents intercepted an incoming call to **Target Telephone 2** from DELLABIANCA. DELLABIANCA said "I got off the exit you over there?" CINTRON replied "Yea I'm on my way now." CINTRON said he "should be there in like 10 minutes".

172.    At approximately 5:06 p.m., agents intercepted an outgoing text from **Target Telephone 2** to DELLABIANCA that said, "2min".  At approximately 5:07 p.m., DELLABIANCA responded, "K".  At approximately 5:12 p.m., investigators observed CINTRON arrive at 22 Atwood Street, Hartford, CT, driving his white BMW X6.  Investigators observed the white BMW park in the rear lot behind 22 Atwood Street and observed CINTRON exit the vehicle.

173.    Moments later, investigators observed a gray Chevy Silverado pickup truck (which is registered to Adam DELLABIANCA) pull into the lot behind CINTRON and park in the rear lot behind 22 Atwood Street.  At approximately 5:12 p.m., investigators observed CINTRON enter the door to 22 Atwood Street.  At approximately 5:15 p.m., investigators observed CINTRON exit from the same door and walk out towards the rear parking lot area.  An investigator then observed CINTRON approach the Chevy truck with his hands in his pockets.  At approximately 5:16 p.m., an investigator observed the Chevy truck and the white BMW exit the parking lot onto Atwood Street and depart the area.

174.    Moments later, the Chevy truck traveled past DEA TFO Mike Silverio as it turned from Atwood Street onto Collins Street.  TFO Silverio observed the driver of the truck to be

Adam DELLABIANCA, whom TFO Silverio is familiar with from a prior matter.  Investigators

followed DELLABIANCA's truck until he pulled into the residential neighborhood where

DELLABIANCA resides.  Shortly thereafter, investigators observed DELLABIANCA drive

away from his neighborhood.  Investigators followed DELLABIANCA as he travelled to a

multi-unit apartment building in Plainville, CT.

175.    I know from my training, experience and participation in this and other

investigations that the term "box" is a common reference to a quantity of narcotics, specifically

heroin and Fentanyl packaged for street level sales.  Moreover, as detailed below, during the

course of this investigation, I know that CINTRON and his narcotics customers use the term

"box" as a coded reference to the boxes that typically hold 500 wax folds of Fentanyl.  Here, I

believe that DELLABIANCA purchased approximately 500 pre-packed wax folds of Fentanyl

from CINTRON, which is substantially more than personal use quantities.  Furthermore, based

on the content of DELLABIANCA's conversation with CINTRON, it is clear that

DELLABIANCA was purchasing the Fentanyl for someone else (i.e., "I'm bout to go pick up the

money from him").

      F.    **Interceptions between DESROCHES and CINTRON.**

176.    Between January 15, 2020 and February 4, 2020, investigators intercepted

numerous communications between CINTRON (over **Target Telephone 2**) and Andrew

DESROCHES (using phone number 860-202-6979), during which they discussed and arranged

for DESROCHES to obtain resale quantities of Fentanyl.  In addition, between January 10, 2020

and February 21, 2020, investigators intercepted communications between GONZALEZ (over

**Target Telephone 1**) and DESROCHES during which they discussed and arranged narcotics

transactions.  Based on the intercepted calls, DESROCHES appeared to obtain multiple bundles

of Fentanyl, and on occasion stacks of Fentanyl, from CINTRON/GONZALEZ every couple of days.

177.   For example on February 4, 2020 at approximately 6:11 p.m., agents intercepted an incoming call to **Target Telephone 2** from DESROCHES over 860-202-6979. During the conversation, DESROCHES asked CINTRON if he was around to which CINTRON replied "I'ma be in Atwood in a few". DESROCHES said that he would be there in "35-40 minutes". CINTRON asked DESROCHES "what you want?" DESROCHES replied "like 5 or 6". CINTRON said "alright".

178.   Based on this call, investigators believed that DESROCHES would be traveling to 22 Atwood Street to obtain 5 or 6 bundles of Fentanyl from CINTRON. At approximately 6:45 p.m., surveillance was established in the area of 22 Atwood Street, Hartford, CT. At approximately 6:52 p.m., agents intercepted an incoming call from DESROCHES to **Target Telephone 2**. DESROCHES said "I'll be there in like 10 minutes". CINTRON said "Alright". DESROCHES said "Alright I'm just going to grab five (5) though". CINTRON said "Alright". At approximately 7:00 p.m., investigators observed CINTRON arrive at 22 Atwood Street, Hartford, CT, driving his white BMW X6. An investigator observed the white BMW park in the rear lot behind 22 Atwood Street and at approximately 7:02 p.m., investigators observed CINTRON enter the door to 22 Atwood Street.

179.   At approximately 7:06 p.m., agents intercepted an incoming call from DESROCHES to **Target Telephone 2**. DESROCHES said "hello I'm here". CINTRON replied "I'm almost there. Where you at?" At approximately 7:09 p.m., investigators observed a blue Hyundai Sonata (which is registered to Diane DESROCHES) arrive and pull into the driveway of 22 Atwood Street and drive to the rear of the building.

74

180.    At approximately 7:12 p.m., investigators observed the same blue Hyundai Sonata exiting from the rear of the building onto Atwood Street with CINTRON's BMW following. Both vehicles departed the area. Shortly thereafter, DEA TFO Mike Breen observed the blue Hyundai Sonata turn westbound onto Collins Street from Atwood Street, at which time TFO Breen clearly observed the driver of the vehicle as Andrew DESROCHES based on DESROCHES's CT Driver's License photograph.  Based on my training, experience and participation in other narcotics investigations I believe that DEROCHES purchased 5 or 6 bundles (i.e., 50 or 60 wax folds or bags) of Fentanyl from CINTRON.

181.    Based on intercepted calls, CINTRON provided narcotics (Fentanyl) to DESROCHES on credit.  For example, during intercepted calls on February 20, 2020, DESROCHES arranged to obtain Fentanyl from CINTRON.  During multiple calls, CINTRON told DESROCHES to go to CINTRON's house and said that his "girl" would provide the Fentanyl to DESROCHES.  The next day, on February 21, 2020, CINTRON over **Target Telephone 2** sent a text to DESROCHES that said: "u owe 150 I gave u a stack yesterday". Later on February 21, 2020, CINTRON over **Target Telephone 2** called DESROCHES and said, in part, "My girl gave you a stack yesterday."  During this call, DESROCHES asked for a couple of days to pay for the stack.  Here, I believe that CINTRON provided a stack of Fentanyl to DESROCHES on credit.

182.    In addition, based on intercepted calls, I suspect that CINTRON has used DESROCHES as a narcotics tester.  For example on January 27, 2020, investigators intercepted an outgoing call from CINTRON using **Target Telephone 2** to DESCROHES using 860-371-7614.  During this call, they discussed, in part, the following:  CINTRON asked, "How is it" to which DESROCHES responded, "Uh… I think the one you have now. I think it's better".

CINTRON, "Oh, alright." . . . CINTRON, "But they not all that?"  DESROCHES, "Nah.  I like what you have now."  CINTRON, "Alright.  So they garbage?"  [DESROCHES laughs].  CINTRON, "Alright."  DESROCHES, "Alright, brother."  I know from my training, experience and participation on this and other narcotics investigations that narcotics distributors will often use customers or other narcotics users to test the quality of their Fentanyl or heroin.  During this call on January 27, 2020, I believe that DESROCHES was informing CINTRON about the quality of a new batch of narcotics (i.e., Fentanyl) that CINTRON had or was considering to purchase.  DESROCHES was telling CINTRON that the narcotics (i.e., Fentanyl) that CINTRON already had was of better quality than this new batch.

## XIII.  EVIDENCE REGARDING UM4027

183.    This investigation has revealed that an unidentified male using telephone number 860-601-4027 (who is referenced herein as "UM4027") is providing kilogram quantities of narcotics to members of this DTO in Connecticut.

### A.    Information provided by CS-2.

184.    CS-2 said, among other things, that an unknown male in the Canaan, CT area provided kilogram quantities of Fentanyl to members of this DTO.  Canaan, CT is in the remote Northwest corner of Connecticut.  CS-2 said that on January 24, 2020, CS-2 obtained approximately two kilograms of Fentanyl from this unknown male in the Canaan, CT area.  CS-2 met the Canaan source on the side of the road in Canaan, CT and retrieved kilograms of Fentanyl from the Canaan source.  CS-2 said that the Canaan source was operating a green Chevy Malibu station wagon with CT license plates.  CS-2 said that the Canaan source had a phone number with an "860" area code and that CS-2 communicated with the Canaan source over this 860

number via text message and telephone calls on January 24, 2020 to arrange the narcotics transaction.

185.     Based on toll records and information provided by CS-2, investigators identified 860-601-4027 as the telephone number used by the Canaan source to communicate with CS-2 to arrange narcotics transactions. An examination of toll records for 860-601-4027 revealed that on January 24, 2020, 860-601-4027 exchanged several text messages and voice calls with the phone used by CS-2. When investigators searched CS-2's phone, they discovered that CS-2 had communications with one 860 number (specifically with 860-601-4027) during the late morning and early afternoon hours on January 24, 2020, which was around that time that CS-2 met with the source in the Canaan, CT area. During further questioning, CS-2 said that he believed that 860-601-4027 likely was the Canaan source's phone number.  Based on this evidence, I believe that CS-2 communicated with the narcotics source in the Canaan, CT area over 860-601-4027 to arrange to obtain two kilograms of Fentanyl from the source on January 24, 2020.  This Canaan source is referred to in this Affidavit as "UM4027."

### B.     Other Evidence regarding UM4027.

186.     On February 2, 2020, investigators were monitoring precision location information for 475-235-5522, which is a phone used by Domingo GUZMAN. As stated above, GUZMAN is a member of AGUILAR's DTO who distribute distributes narcotics and collects narcotics proceeds on behalf of AGUILAR. Intercepted communications and other evidence developed during this investigation have revealed that GUZMAN uses multiple telephones, including 475-235-5522 and 203-394-1639, to facilitate narcotics trafficking and money laundering activities. On February 2, 2020, precision location information for 475-235-5522 (a GUZMAN phone) showed that GUZMAN traveled to the East Canaan, CT area. Investigators

subsequently obtained toll records for 203-394-1639, which is another phone that is used by

GUZMAN to discuss and arrange narcotics transactions. Toll records for 203-394-1639 showed

that on February 2, 2020, telephone number 203-394-1639 (GUZMAN) had multiple telephone

calls and text messages with 860-601-4027 (UM4027) that began at approximately 5:14PM and

ended with an incoming call from 203-394-1639 (GUZMAN) to 860-601-4027 (UM4027) at

approximately 6:10PM, which is around the same time that precision location information

showed that GUZMAN was in the East Canaan, CT area. Based on this evidence and my

knowledge of this investigation, I believe that GUZMAN communicated with the source

(UM4027) in the Canaan, CT area over 860-601-4027 to arrange to conduct a narcotics

transaction.

187.    On February 4, 2020, I obtained subscriber and toll records for 860-601-4027

from Sprint. Sprint records listed the subscriber as a Jesus Ayon, with an address of 387 Norfolk

Road, East Canaan Connecticut. A search of the name "Jesus Ayon" through paid law

enforcement databases uncovered no person with that name living in East Canaan, Connecticut

or anywhere else in the State of Connecticut. I know from my training, experience and

participation in other narcotics investigations that often narcotics traffickers will provide

fictitious names to telephones service providers in attempt to mask their identity. I suspect that

this is likely the case here.

188.    On February 6, 2020, U.S. Magistrate Judge Thomas O. Farrish authorized a

warrant for E-911 precise location data for 860-601-4027 (UM4027's phone).  The ping data

generally produced large meter hits in the East Canaan, CT area.  On several occasions, the ping

data showed the phone in the area of Laurel Brook Farms at 390 Norfolk Road, East Canaan, CT.

As noted above, the subscriber address for 860-601-4027 (UM4027's phone) is listed at 387

Norfolk Road, East Canaan, CT (**Target Premises #5**). An open source search for the address

387 Norfolk Road, East Canaan, CT (**Target Premises #5**) revealed that the property was

associated with Javier PB Cleaning LLC.

189.    On February 12, 2020, investigators (including your Affiant) went to Laurel

Brook Farms in East Canaan, CT. Investigators observed a gray Chevy Malibu station wagon

parked at the farm. As discussed above, CS-2 said that the Canaan source (UM4027) was

driving a green Chevy Malibu station wagon when the source provided CS-2 with two kilograms

of Fentanyl. Significantly, a Chevy Malibu station wagon is a very distinctive vehicle. Further,

the gray coloring for this particular Chevy Malibu could easily be mistakenly described as light

green. CT DMV records revealed that this Chevy Malibu is registered to Javier PB Cleaning

LLC at 387 Norfolk Road, East Canaan, CT (**Target Premises #5**).

190.    On February 19, 2020, investigators intercepted a series of text communications

between GONZALEZ, using **Target Telephone 1**, and AGUILAR. During these intercepted

communications, AGUILAR informed GONZALEZ that "two new vehicles are ready" and went

on to say that "I do not have anyone to go get them". Based on my training, experience and

participation in this and other narcotics investigations, I believe that "vehicles" is a coded

reference for kilograms of narcotics and that AGUILAR was telling GONZALEZ that two

kilograms were ready. Within that same message, AGUILAR inquired if GONZALEZ could

retrieve the kilograms because AGUILAR had no one to do so. The text message conversation

continued and AGUILAR wrote to GONZALEZ "They tell me those are really good", which is a

reference to the quality of the kilograms. GONZALEZ then inquired as to where he could

retrieve them (the kilograms) and AGUILAR responded "It is a town called Canan [sic] it is

about 1:15 minutes from the area". Here, I believe that AGUILAR is referencing Canaan, CT

and I know that Canaan, CT is approximately a one hour drive from the Hartford, CT area. GONZALEZ inquired which state and AGUILAR responded, "Here in CT".

191.    Intercepted communications between AGUILAR and GONZALEZ revealed that GONZALEZ never retrieved the kilograms from Canaan, CT.  Further, additional communications revealed that the kilograms may still be in the Canaan, CT area.  For example on February 23, 2020, AGUILAR sent a text to GONZALEZ that said, in part, "they are calling me here like crazy about the cars, I asked for them because you told me yes to do it and I don't have anybody else now".  Here, I suspect that AGUILAR is telling GONZALEZ that the unknown source who is in possession of the kilograms is calling AGUILAR about the retrieval of the narcotics. AGUILAR says that GONZALEZ told AGUILAR that he (GONZALEZ) would do the pickup and that if GONZALEZ doesn't do the pickup, AGUILAR doesn't have anyone who can.  Based on the intercepted communications and my knowledge of this investigation, I believe that the source (UM4027) that AGUILAR is referencing in Canaan, CT is the holder of 860-601-4027 and that this source is in possession of kilogram quantities of narcotics, likely Fentanyl.

192.    On March 6, 2020, Magistrate Judge Thomas O. Farrish authorized search warrants for E-911 precise location information for 860-601-4027 (UM4027's phone) and for the use of a cell site simulator (CSS) to locate this cellular phone.  On March 13, 2020, during the early morning hours, investigators used a cell site simulator (CSS) to locate 860-601-4027.  The CSS indicated that he cellular telephone (UM4027's phone) was located at the single family residence located at 387 Norfolk Road (Route 44), East Canaan, CT (**Target Premises #5**).  As discussed above, Sprint records listed the subscriber address for 860-601-4027 as 387 Norfolk Road, East Canaan, CT.  Further, on this same date during the early morning hours

80

(approximately 3:46 a.m.), your Affiant and another investigator observed a Chevy Malibu station wagon parked in the driveway at 387 Norfolk Rd, East Canaan CT (**Target Premises #5**). As discussed herein, this car matches the description of the car that UM4027 was driving when UM4027 provided CS-2 with two kilograms of Fentanyl.

193.    Significantly, when investigators were at 387 Norfolk Road at approximately 3:46 a.m., investigators observed numerous lights on in the residence, indicative of early morning activity.  Investigators suspect that the occupants of 387 Norfolk Road (**Target Premises #5**), including UM4027, work at the farm and may leave the residence prior to 6:00 a.m. Accordingly, investigators are requesting authorization to search 387 Norfolk Road during the nighttime hours so that investigators can locate UM4027 and the cellular phone with call number 860-601-4027 (UM4027's phone) within the residence.

## XIV.   EVIDENCE REGARDING JAY

194.    Investigators have developed evidence that an unidentified male who is referred to as "JAY," who is in the New York City area and uses phone number 929-513-2970, is a money broker who is involved in laundering narcotics proceeds.  Specifically, investigators believe that GUZMAN provided JAY with narcotics proceeds so that JAY could launder these proceeds.

195.    As discussed herein, GUZMAN is a member of this DTO who collects narcotics proceeds on behalf of AGUILAR.  On multiple occasions, investigators intercepted communications during which GUZMAN was arranging to pick-up narcotics proceeds from narcotics customers on behalf of AGUILAR.  Further, in November 2019, investigators from another law enforcement agency advised that GUZMAN conducted a money drop of approximately $90,000 of suspected drug proceeds in New York City.

196.    A review of toll records for 929-513-2970, which is used by "JAY", shows that on January 21, 2020 between the hours of approximately 7:21AM and 11:01AM, this number communicated on several occasions with GUZMAN using 203-873-7826.  During this investigation, investigators identified 203-873-7826 as one of the phones that were used by GUZMAN.  A review of precision location data for another phone used by GUZMAN (475-235-5522) revealed that on that day (January 21, 2020), GUZMAN traveled from Connecticut to Brooklyn, New York.  At approximately 11:03 AM, precision location data placed GUZMAN's phone in the area 45th Street, between 8th and 9th Avenue.  As discussed below, this is the same area that GUZMAN traveled to on February 17, 2020 after arranging to deliver narcotics proceeds to JAY.

197.    On February 17, 2020 at approximately 11:18AM, GUZMAN using **Target Telephone 3** was intercepted making an outgoing call to 929-513-2970, which is used by an unidentified male referred to as JAY.  GUZMAN and JAY had the following conversation:

JAY:        Yeah, this is JAY.

GUZMAN:    Alright. Yeah, JAY look, I call you for [to] make appointment for today.

JAY:        You... [Stammers] want on [for] today? What about uh..., 5:00 afternoon?

GUZMAN:    5:00?

JAY:        Yeah, afternoon.

GUZMAN:    Alright, but look... Um... 5:00. Where is there? I need it [the] address now. But see... Yo, but I'm far. So I gotta get the address.

JAY:        Oh, okay. Let me, the... [Stammers] Send me the pin number first.

GUZMAN:    Okay, hold on.

JAY:        Send me the pin number.

198.   In the above conversation, GUZMAN and JAY make preliminary arrangements to meet later in the day. GUZMAN asks JAY to provide the meet address.  JAY responds that prior to providing the address he needs the "pin".  I know from my training, experience and participation in this and other investigations that often money launderers require a code or "pin" from the person they collect money from in order to verify that they are meeting with the correct person.  Based on the content of this conversation, investigators believe that GUZMAN was arranging to transfer a quantity of narcotics proceeds to JAY who would then oversee the laundering of those proceeds.

199.   On February 17, 2020 at approximately 11:33AM, GUZMAN using **Target Telephone 3** received an incoming call from JAY using 929-513-2970.  GUZMAN and JAY then had the following conversation;

GUZMAN:   Yo!

JAY:   Hey buddy, or you, you can text me the... [Stammers] or you can uh... [Stammers] read for me the last four (4) numbers.

GUZMAN:   I know, but listen...

JAY:   Uh-huh.

GUZMAN:   You get, you get the number right?

JAY:   No, no, no, no. No, nothing. Nothing. I did not get any message, no.

GUZMAN:   Oh, okay.

JAY:   You can text for me or... You know. You can text for me. Yeah, I don't have it right now.

GUZMAN:   Okay, but I got it right here. The thing is that...  I'm driving, this is why. Let me get a... [Voices Overlap]

JAY:   Oh, oh, okay. It's... [Stammers] It's fine, it's fine. So uh... What about you, you... Uh... Can you just tell me the last four (4) numbers.

GUZMAN:   Okay. Wait, hold on. I gotta see... Let me see, hold on. It's L-8-6...

JAY:   O-8-6?

GUZMAN:   No, L. [Voices Overlap]

JAY:   O. L.

GUZMAN:   8. [Voices Overlap]

JAY:   Okay. Uh-huh.

GUZMAN:   6-4.

JAY:   Uh-huh.

GUZMAN:   7-3.

JAY:   Uh-huh.

GUZMAN:   0-0-7-B. (L86473007B)

JAY:   Oh, okay, okay.

GUZMAN:   I write it down without the... You know, the last letter like this... [Voices Overlap]

JAY:   Yeah.

GUZMAN:   You know what I mean?

JAY:   Yeah, yeah. It's fine. I... [Stammers] got it. I got it, it's fine.

GUZMAN:   Alright, you... [Voices Overlap]

JAY:   Let me... [Stammers] Let me send my address for you. Okay?

GUZMAN:   Yeah, please. You think I can see you before that time?

JAY:   Yeah, whatever you uh... Any time, okay?

GUZMAN:   Alright, just send me the uh..., one address please. [Voices Overlap]

JAY:   Yeah, yeah, okay.

GUZMAN:    Alright, I'ma call you when I'm uh..., closer with the address.

200.    The conversation begins with JAY explaining to GUZMAN that he did not receive the "pin". GUZMAN then recites the following code "L86473007B" to "JAY," which I suspect to be the serial number for a note of US currency, likely a one dollar bill. A query of the website for the Federal Bureau of Engraving and Printing states that currently $1 and $2 dollar notes have serial numbers that consist of one letter, eight digits and one letter.[6] Additionally, I know from my training, experience and participation in this and other investigations that money launderers often use the serial numbers on US Currency notes as "pins" or codes to verify the identity of the person with whom they are meeting. Their conversation ended with GUZMAN informing JAY that he would call JAY when he got close to the meet location. Worth noting, during this time-frame, investigators were not intercepting text message communications over **Target Telephone 3** due to technical problems and, as a result, investigators may have missed additional communications.

201.    At approximately 12:25PM, in anticipation of GUZMAN delivering a quantity of narcotics proceeds to JAY, surveillance was established in the area of GUZMAN's home at 365 Pearl Lake Road in Waterbury. At approximately 12:30PM, an investigator observed GUZMAN and female exit the residence and enter a white Jeep Cherokee. Previously during this investigation, GUZMAN has been observed on numerous occasions operating this white Jeep. At this time, investigators observed GUZMAN placing an item in the rear passenger's side of his white Jeep. GUZMAN's Jeep then departed the residence. GUZMAN was the driver of the Jeep and the female was the front seat passenger.

---

[6] Up through series 1995 all Federal Reserve notes consisted of one letter, eight digits and one letter.

202.    Investigators followed GUZMAN's Jeep to Brooklyn, New York, where investigators observed the Jeep stop briefly in the area of 45th Street between 8th and 9th Avenue. While GUZMAN's Jeep was stopped, the view of investigators was briefly obstructed. Seconds later, GUZMAN's Jeep departed the area and was followed north out of the New York City area. Investigators believe that while on 45th Street, GUZMAN completed the delivery of narcotics proceeds to "JAY."

203.    On or about February 20, 2020, U.S. Magistrate Judge Robert A. Richardson authorized a warrant for E-911 location data for 929-513-2970, which is used by JAY. E-911 precise location information for 929-513-2970 revealed that the holder of the device (JAY) is frequently in the area of 45th Street between 8th and 9th Avenue during daytime hours.

### ADDITIONAL INFORMATION REGARDING TARGET PREMISES

204.    The requested search warrants for **Target Premises #1 though #5** are for the residences of significant members of this DTO, namely, GUZMAN, GONZALEZ, CINTRON, ESTREMERA and UM4027. Additional information regarding these residences includes the following:

- **Target Premises #1 (365 Pearl Lake Road, Waterbury, CT)** is the residential address of Domingo GUZMAN. During this investigation, GUZMAN used 475-235-5522 and Target Telephone 3. E-911 precise location data on 475-235-5522 and Target Telephone 3 revealed that GUZMAN resides at **Target Premises #1**. In addition, physical surveillance during this investigation has corroborated that GUZMAN resides at **Target Premises #1**. Moreover, as discussed above, on December 17, 2019 investigators observed GUZMAN travel directly from his residence at 365 Pearl Lake Road (**Target Premises #1**) to a stash location used by ESTREMERA and COTTO, and then to another location in Hartford to

86

meet with ESTREMERA to conduct what investigators believe was a narcotics-related transaction. On March 13, 2020, investigators checked paid law enforcement databases which associated GUZMAN with **Target Premises #1**. As of March 15, 2020, CT DMV records list **Target Premises #1** as GUZMAN's residence. On March 15, 2020 at approximately 6:15 a.m., an investigator drove by **Target Premises #1** and observed a silver BMW parked at the residence. Throughout this investigation, investigators have observed GUZMAN operating the BMW on multiple occasions. On March 17, 2020, investigators checked paid law enforcement databases which associated GUZMAN with **Target Premises #1**.

- **Target Premises #2 (14 Prospect Street, 1st Floor, New Britain CT)** is the residential address of Armando GONZALEZ. E-911 precise location data on Target Telephone **1** has revealed that GONZALEZ resides at **Target Premises #2**. In addition, physical surveillance has shown that GONZALEZ resides at 14 Prospect Street (**Target Premises #2**). As discussed above, on January 30, 2020, investigators observed GONZALEZ leave his residence at 14 Prospect Street (**Target Premises #2**) while carrying a bag, enter a white BMW and travel to meet with GUZMAN. Based on intercepted communications and physical surveillance, investigators believe that GONZALEZ provided GUZMAN with $13,000 in narcotics proceeds during this meeting. Further, as discussed above, after TOMAS ALERS was arrested while traveling with narcotics to meet with GONZALEZ at 22 Atwood Street, GONZALEZ called SALGADO and said, in substance, that he does not feel safe with the narcotics at 22 Atwood Street. In response, SALGADO told GONZALEZ that he could process and package the narcotics in their baby's room with the door locked (i.e., at their residence at 14 Prospect Street, New Britain, CT). During the early morning hours of March 13, 2020, an investigator drove by **Target Premises #2** and observed a vehicle registered to Primetime Auto

87

parked at **Target Premises #2**.  Throughout this investigation, GONZALEZ has operated

vehicles registered to Primetime Auto.

• **Target Premises #3 (791 Center Street, Manchester, CT)** is the residential

address of David CINTRON.  Precise location data for **Target Telephone 2** has revealed that

CINTRON resides at **Target Premises #3**.  For example, E-911 ping data for 860-797-0895

(which is a phone used by CINTRON), which provide very good meter hits, shows that

CINTRON is at **Target Premises #3** during the overnight hours. Physical surveillance also has

shown that CINTRON resides at **Target Premises #3**.  On March 13, 2020 in the early morning

hours, an investigator drove by **Target Premises #3** and observed CINTRON's BMW X6

parked in the driveway at **Target Premises #3**.  As discussed herein, investigators have observed

CINTRON operating his BMW X6 on numerous occasions.  Toll records and E-911 information

with regard to 860-797-0895 show that this device is active and currently being used and held by

CINTRON.  Toll records show that CINTRON is continuing to use this phone to communicate

with his narcotics trafficking associates.  For example toll records show that CINTRON over

860-797-0895 still is in frequent contact with several of CINTRON's known customers,

including Andrew DESRCOHES (who uses 860-202-6979) and Adam DELLABIANCA (who

uses 860-371-7349), among others.  Moreover, E-911 ping data for 860-797-0895 show that the

phone is at **Target Premises #3** virtually every night through the overnight hours.  For example,

during the evening of March 17-18, 2020, E-911 ping data for 860-797-0895 showed that the

phone was at **Target Premises #3** during the overnight hours.

Further, investigators believe that CINTRON went from **Target Premises #3** to conduct

the transaction with HOULE on February 4, 2020, during which CINTRON sold 7 stacks (700

bags) of Fentanyl to HOULE, and then CINTRON went back to **Target Premises #3** after the

88

transaction.  As discussed above, the February 4, 2020 transaction between CINTRON and

HOULE was observed by investigators, who ultimately seized the Fentanyl, arrested HOULE

and obtained a post-*Miranda* statement from HOULE regarding this transaction and her on-going

narcotics dealings with CINTRON.  Evidence regarding this February 4, 2020 transaction

includes, among other evidence, the following: At 7:34pm, E-911 ping data for 860-797-0895

showed that the device was in or around 791 Center Street (**Target Premises #3**).  At 7:43pm,

HOULE called CINTRON and asked where she should go.  HOULE said she was by Atwood

Street and CINTRON said that he was elsewhere and would send the address to HOULE.  At

7:45pm, CINTRON (over Target Telephone 2) sent a text message to HOULE that said, "1261

burnside ave east hartford," which is the address for a McDonald's restaurant that is close to

CINTRON's residence at 791 Center Street (**Target Premises #3**).  At 7:49pm, E-911 ping data

for 860-797-0895 showed that the device was in or around 791 Center Street (**Target Premises

#3**).  At approximately 8:02pm, investigators observed CINTRON arrive in his BMW and park

in the McDonalds lot.  At 8:05pm, E-911 ping data for 860-797-0895 showed that the device was

in or around the McDonalds at 1261 Burnside Ave, East Hartford, CT.  At approximately 8:15

p.m., investigators observed HOULE arrive at the McDonalds, briefly get into CINTRON's car

and then return to her car.  After the meeting between CINTRON and HOULE, CINTRON drove

away from the McDonalds lot.  At 8:20pm, E-911 ping data for 860-797-0895 showed that the

device was in or around 791 Center Street (**Target Premises #3**).  Based on this evidence,

investigators believe that CINTRON went from **Target Premises #3** to sell Fentanyl to HOULE

at the McDonalds and, after the transaction, CINTRON went back to **Target Premises #3** with

the proceeds from the sale.  Based on all of this evidence, I believe that CINTRON's cellular

phone, 860-797-0895, in addition to other evidence of CINTRON's narcotics distribution activities, will be located at **Target Premises #3**.

- **Target Premises #4 (14 Judson Street, East Hartford, CT)** is the residential address of Daniel ESTREMERA.  Precision location data on 860-682-8578 (a phone used by ESTREMERA) has revealed that ESTREMERA resides at **Target Premises #4**.  Physical surveillance also has shown that ESTREMERA resides at **Target Premises #4**.  For example, on February 26, 2020, an investigator observed ESTREMERA departing the residence in one of the vehicles registered to ESTREMERA.  On multiple occasions – including, February 25, 2020, February 26, 2020 and March 13, 2020 – investigators observed vehicles registered to ESTREMERA parked at **Target Premises #4** consistent with ESTREMERA residing at **Target Premises #4**.  During this investigation, ESTREMERA was the known user of telephone number 860-682-8578.  As discussed above, ESTREMERA is currently on federal supervised release.  The U.S. Probation Office confirmed that 860-682-8578 is the number for ESTREMERA.  Toll records and other evidence have shown that during this investigation, ESTRMERA uses 860-682-8578 to communicate with his narcotics trafficking associates.  On numerous occasions investigators acquired E-911 precision location data for 860-682-8578, which placed the device in and around the area of 14 Judson Street (**Target Premises #4**) during the overnight hours, consistent with ESTREMERA living at **Target Premises #4**.  More recently, on March 13, 2020, investigators confirmed that ESTREMERA was still using this device for narcotics-related activity.  On March 13, 2020, investigators arrested Joseph COTTO who maintained a stash of narcotics at an apartment at 48 South Street, West Hartford, CT on behalf of ESTREMERA.  On that date (March 13, 2020), investigators seized a large quantity of Fentanyl from the stash apartment at 48 South Street maintained by COTTO.  In addition, investigators seized COTTO's

90

phone. As discussed above, during a search of COTTO's phone, investigators found a stored WhatsApp chat that appeared to indicate that ESTREMERA acquired the apartment at 48 South Street (i.e., the stash apartment) for COTTO. This is consistent with COTTO's post-arrest statement, during which he said that the owners of the narcotics that were seized from the apartment provided COTTO cash to pay the rent for the apartment. Moreover, COTTO's phone showed that COTTO continues to have telephone communications with ESTREMERA over 860-682-8578. Indeed, COTTO's phone showed that COTTO and ESTREMERA spoke as recently as March 11, 2020. Based on this evidence, I believe that ESTREMERA continues to use 860-682-8578 and that this device will be located at **Target Residence #4**, along with other items used for narcotics distribution.

- **Target Premises #5 (387 Norfolk Road (Route 44), East Canaan, CT)** is the residence of UM4027. Based on surveillance, subscriber information, E-911 ping data and the use of a cell site simulator, UM4027 resides at the single family residence premises at 387 Norfolk Road, East Canaan, CT (**Target Premises #5**). As discussed above, Sprint records listed the subscriber address for UM4027's phone (860-601-4027) as **Target Premises #5**. E-911 ping data for UM4027's phone (860-601-4027) is consistent with UM4027 residing at **Target Premises #5**. During the early morning hours (approximately 3:46pm) on March 13, 2020, investigators conducted surveillance in the area of **Target Premises #5.** Investigators used a cell site simulator to locate UM4027's phone (860-601-4027). The cell site simulator showed that UM4027's phone (860-601-4027) was at **Target Premises #5.** Further, investigators observed a Chevy Malibu station wagon parked in the driveway at 387 Norfolk Rd, East Canaan CT (**Target Premises #5**). As discussed above, this car matches the description of the car that UM4027 was driving when UM4027 provided CS-2 with two kilograms of Fentanyl. As also

discussed above, when investigators were at 387 Norfolk Road (**Target Premises** #5) during the early morning hours, investigators observed lights on in the residence and activity in the residence.  Investigators suspect that the occupants of 387 Norfolk Road (**Target Premises #5**), including UM4027, work at the farm and may leave the residence prior to 6:00 a.m.

Accordingly, investigators are requesting authorization to search 387 Norfolk Road  (**Target Premises #5**) during the nighttime hours so that investigators can locate UM4027 and the cellular phone with call number 860-601-4027 (UM4027's phone) within the residence.

## TRAINING & EXPERIENCE OF THE AFFIANT

205.    Based on the foregoing facts, I believe that the **Target Premises** are all locations which contain evidence, fruits and/or instrumentalities of the drug trafficking activities of members of this drug trafficking organization.  From my training, experience and involvement in numerous narcotics investigations, and that of others agents participating in this investigation, I know that residences of significant narcotics traffickers – such as, **Target Premises #1 through #5** – often contain evidence, fruits and/or instrumentalities of drug trafficking activities.  Based on my experience, materials searched for and recovered from locations such as these locations have included, among other things, the following: books and records reflecting drug sales, the transfer or transportation of drugs and the transfer of drug proceeds; records or ledgers showing drug quantities provided and amounts of monies owed for drugs; records reflecting the names, addresses and telephone numbers of co-conspirators; photographs of co-conspirators; sales receipts and other records reflecting the expenditure of monies that are proceeds from unlawful drug distribution; evidence of unexplained wealth; evidence of financial transactions; U.S. Currency; money wrappers; records of bank transactions made to conceal and launder drug trafficking proceeds; records of financial accounts that contain drug proceeds; records,

photographs and other evidence of real property, automobiles and other items of value that were purchased with drug proceeds; records of control, ownership and/or use of property and vehicles; cellular telephones used by members of this DTO; records and documents reflecting associates' telephone numbers and locations; records of travel in connection with drug trafficking activity; computers, computer disks, answering machines and other electronic devices that contain evidence of drug trafficking and money laundering activities; various controlled substances; drug paraphernalia such as scales and packaging material; firearms, weapons and/or ammunition; safes; documentary evidence of the ownership of residences, vehicles, storage containers, mail boxes and other assets; and other evidence of narcotics trafficking activities.

206.   In this particular case, I believe that such fruits, instrumentalities and/or evidence of the targets' conspiracy to distribute and distribution of controlled substances will be present in **Target Premises #1, #2, #3, #4 and #5.**

207.   Based upon the totality of the facts and circumstances set forth herein, and based on my training and experience and consultations with fellow law enforcement officers, I know:

(a)   that narcotics traffickers must maintain on hand U.S. currency in order to maintain and finance their on-going narcotics business;

(b)   that narcotics traffickers maintain books, records, receipts, notes, ledgers, money orders and other papers relating to the transportation, receipts, sale and distribution of controlled substances. That the aforementioned books, records, receipts, notes, ledgers, etc., are maintained where traffickers have ready access to them -- frequently at their residences and stash houses, including in the garages at those locations;

(c)   that persons involved in narcotics trafficking conceal in their residences

and stash houses, including garages, caches of drugs, scales, drug packaging materials, cutting agents and diluents, large amounts of currency, financial instruments, precious metals, jewelry and other items of value and/or proceeds of drug transactions; and the evidence of financial transactions relating to obtaining, transferring, secreting or spending of sums of money made from narcotics trafficking activities;

(d)     that it is common for narcotic traffickers to hide contraband, proceeds of drug sales and records of drug transactions in secure locations within their residences and stash houses, including attached and detached garages, for ready access and for concealment of these items from law enforcement authorities;

(e)     that narcotic traffickers commonly maintain addresses or telephone numbers in books, papers, cellular telephones or electronic organizers which reflect names, addresses and/or telephone numbers of their clients and associates in the drug trafficking organization.  Traffickers also maintain photographs and videotapes of participants and associates in narcotic trafficking activity, and property acquired as a consequence of narcotics trafficking activities; and

(f)     that narcotic traffickers commonly have in their possession, or at their residences, including in garages at those residences, firearms or other weapons that are used to protect and secure a drug trafficker's property.

208.    Based on the aforementioned information, I believe there is probable cause to believe that fruits, instrumentalities and/or evidence of violations of Title 21, United States Code, Sections 841(a)(1) and 846 (possession with intent to distribute controlled substances and conspiracy to distribute controlled substances), will be located at **Target Premises #1 through #5**, including the following: cellular phones used by members of this DTO; records and notations

reflecting the receipt, distribution and sale of controlled substances, such as receipts, ledgers, notebooks and records of customers, customers' telephone numbers, customers' addresses and sources of supply; documents reflecting the residences, vehicles and other locations used by members of this DTO; keys to properties, vehicles and/or storage facilities used by members of this DTO; documents reflecting travel, such as passports, visas and receipts for interstate and/or foreign travel; records reflecting the use of rental vehicles; paraphernalia used to weigh and package narcotics for distribution such as scales and plastic bags; U.S. Currency and other evidence of unexplained wealth; and other items more specifically set forth in Attachment A to the search and seizure warrant. Accordingly, I request that search warrants be issued for each of **Target Premises #1, #2, #3 #4, and #5.**

## CONCLUSION

209.    Based on the aforementioned information, there is probable cause to believe and I do believe that during the period set forth above, Eduardo AGUILAR-LINARES ("AGUILAR"), Domingo GUZMAN, Jesus TORRUELLA, Felix CANCEL, Armando GONZALEZ, David CINTRON, Coraima SALGADO, Daniel ESTREMERA, Jonathan FALCON, Reinaldo COLON, Jr., Tomas ALERS, Jessica HOULE, Adam DELLABIANCA, Andrew DESROCHES, UM4027 and JAY conspired to possess with intent to distribute and to distribute controlled substances, in violation of 21 U.S.C. §§ 846 and 841(a)(1), and possessed with intent to distribute and distributed controlled substances, in violation of 21 U.S.C. § 841(a)(1). Accordingly, I request that criminal complaints and arrest warrants be issued for each of these individuals.

210.    There is also probable cause to believe, and I do believe, that the items described in Attachment A, which are fruits, instrumentalities and evidence of these crimes will be found at

**Target Premises #1 through #5.** Accordingly, I request the issuance of search warrants for **Target Premises #1 through #5**, as discussed herein.

211.    Because this is an application that pertains to an ongoing criminal investigation, and because disclosure of the information contained herein as well as disclosure of the warrants and complaints being requested herein may compromise the investigation and increase the risk of harm for the law enforcement officers responsible for conducting the arrests and searches, I request that the warrants, applications, complaints and this affidavit be ordered sealed by the Court, until further order of the Court.

Jeffrey Poulin
Task Force Officer, DEA

Subscribed and sworn to before me
this ___/8___ day of March
2020, at Hartford, Connecticut.

/s/
HON. THOMAS O. FARRISH
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A
### (Items to be Seized)

a.      United States currency, money orders and other financial instruments;

b.      books, records, receipts, notes, ledgers, and other papers and documentation relating to the transportation, receipt, sale and distribution of controlled substances;

c.      proceeds of drug sales and records of drug transactions; precious metals, jewelry and other items of value that may constitute proceeds of drug transactions; the evidence of financial transactions relating to obtaining, transferring, secreting or spending of sums of money made from engaging in narcotics trafficking activities;

d.      contraband, quantities of narcotics, scales, cutting agents and diluents and drug packaging materials;

e.      addresses or telephone numbers in books, papers, cellular telephones or electronic organizers, and their electronically stored contents, which reflect names, addresses, telephone numbers of and text messages to or from their associates and/or clients in narcotic trafficking activity; photographs and videotapes of participants and associates in narcotic trafficking activity and property acquired as a consequence of narcotics trafficking activities;

f.      firearms, ammunition and other weapons;

g.      safes and other secure storage containers and their contents;

h.      identification documents and keys evidencing a possessory interest in premises, vehicles and storage containers.